**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Eduardo HERRERA, Defendant-Appellee.**

No. 81-5544.

United States Court of Appeals, Eleventh Circuit.

Aug. 19, 1983.

---

Stanley Marcus, U.S. Atty., William C. Turnoff, Asst. U.S. Atty., Miami, Fla., Frank J. Marine, Appellate Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.A.

Ellis S. Rubin, Thomas James O'Grady, Miami, Fla., for Herrera.

Before TJOFLAT, KRAVITCH and HATCHETT, Circuit Judges.

TJOFLAT, Circuit Judge:

The government appeals the district court's order suppressing physical evidence found during a search of appellee's vessel, the *Sea Wind,* and certain statements the appellee made prior to and during the search of the vessel.[1] The government also appeals the exclusion of statements the appellee made during a post-arrest interrogation. We reverse the suppression of the physical evidence and the statements made prior to and during the search. We affirm the suppression of the statements made during the post-arrest interrogation.

## I.

This case grows out of FBI anti-terrorist activities in the Miami area. Near the time of the search in question agents had been closely monitoring a Cuban exile group, Alpha 66. The group's stated purpose was to overthrow the Castro regime in Cuba. It had been conducting an extensive propaganda campaign about a "Plan Maximo Gomez," under which group members would enter Cuba to carry out a program of sabotage.

On January 14, 1981, FBI special agent Diaz received a telephone call that a 14-foot red and white boat would be used to take several men to Cuba the next day. The tipster, speaking in Spanish, said the boat was somewhere in Miami and that a group of men armed with rifles, handguns, and possibly explosives would transport the boat by land to the Key Largo-Marathon area the next morning, where it would be launched. A larger boat would be used to tow the smaller boat at least part of the way to Cuba. Agent Diaz personally interviewed the informant that same evening for an hour and a half, during which time the informant repeated his prior statements. The informant had not previously

---

1. We have jurisdiction of this appeal under 18 U.S.C. § 3731 (1976).

provided information to law enforcement authorities.

Acting pursuant to this tip, the next day FBI agents maintained surveillance of U.S. 1—the only access road from Miami to the Florida Keys—and in Key Largo spotted a camper-type pickup truck containing seven male passengers heading south and towing a 14-foot red and white boat. The agents followed the truck to the Knight's Key Camp Grounds in Marathon, Florida, where they observed a larger 28-foot boat, the *Sea Wind,* moored at the Knight's Key marina, about 10 to 15 yards south of where the truck had parked. Both boats and the truck remained stationary throughout the afternoon.

Observing with a night vision scope, two agents saw an individual transfer a package two or three feet in length from the smaller boat to the larger boat at about 7:00 p.m. that evening. Another such transfer occurred at 8:15 p.m. The agents observed seven individuals on the *Sea Wind* and saw some of them walk to the smaller boat and back to the *Sea Wind* at intervals. An agent testified that he saw persons aboard the *Sea Wind* reading what appeared to be charts or maps, but conceded that from his observation point ½ to ¾ miles from the boat, they could as well have been reading newspapers.

Around 11:00 p.m., the agents saw the lights go out on the *Sea Wind,* and then at 12:15 a.m. they saw the lights go back on. Activities aboard the boat increased at this time and individuals were seen moving about and talking. A supervising agent called an assistant U.S. Attorney to determine the agents' authority for a search. Concluding there were possible customs violations involving firearms, the FBI agents decided to call for the assistance of Customs officers. Two Customs officers arrived shortly thereafter, and conferred with the FBI agents about authority to conduct a search. After the conference with FBI agents, Customs officer Hoversen concluded that Customs authority permitted a search.

An armed group of FBI agents and Customs officers approached the *Sea Wind,* with the Customs officers in the lead. The appellee shouted out "we see you, we see you" as the officers approached, as if to indicate that those on the boat intended no resistance. The Customs officers identified themselves as such, and asked who was in charge; appellee replied "I'm in charge of the boat." The Customs officers next stated that they were going to search the boat, and the rest of the search party began removing the men from the boat.[2] FBI agents placed the men against a fence at the marina and frisked them for weapons.

Two Customs officers and an FBI explosives expert then boarded the boat. Officer Hoversen immediately noticed partially covered rifles next to the cabin door. As the search began, appellee—now off the boat—volunteered the statement that there were weapons on board that would be found anyway. The search produced three rifles, two handguns, and smoke grenades.

The officers next proceeded to the smaller boat, which had remained attached to the pickup truck throughout. Appellee immediately warned the agents guarding him that there were explosives on that boat, adding that he did not want anyone to get hurt. He stated further that the explosives were inside plastic bags. An agent gave this information to Customs officers who found a .50 caliber recoilless rifle, six plastic bags containing pipe-bombs, and a package with handguns and ammunition.

The grand jury returned an indictment against appellee and the six others present charging them with receiving and possessing 12 illegal pipe-bombs; receiving and possessing 12 fragmentation grenades with-

---

**2.** Customs officer Hoversen indicated that removal of the occupants from a boat such as the *Sea Wind* is standard procedure for a Customs search so that the officers can maintain control over those occupants. The occupants are detained until the search is complete; they are not under formal arrest, but neither are they free to leave.

out serial numbers; and receiving and possessing an unregistered pipe-bomb. The indictment also charged appellee with receiving, possessing, and transporting in commerce as an illegal alien in the United States a number of other weapons.[3]

Appellee moved to suppress the weapons found on the two boats and the statements he had made to the officers on the scene. The district court granted the motion with regard to the weapons found on the *Sea Wind*. It ruled first that probable cause for a search of the *Sea Wind* did not exist at the time of the initial boarding. The court also ruled that the initial seizure and subsequent search of the *Sea Wind* could not stand on the authority of 19 U.S.C. § 1581(a) (1976). It reasoned that section 1581(a) constitutionally authorizes the boarding of a vessel without suspicion of illegal activity for purposes of making document and safety inspections, but not for the purpose of making weapons searches, the sole purpose of the boarding here. Finally, it concluded that, although section 1581(a) might constitutionally authorize a weapons search premised upon a reasonable suspicion of illegal activity based upon articulable facts, section 1581(a) did not authorize the search in question because there was no evidence of a border crossing, which the court apparently believed was an additional constitutional requirement.

Having ruled the search of the *Sea Wind* illegal, the district court also suppressed appellee's statement "we see you, we see you" upon the approach of the search party; the statement that he was in charge of the *Sea Wind;* and the statement that there were firearms aboard the *Sea Wind* that would be found anyway. The court implicitly ruled all three statements to be fruits of the illegal search of the *Sea Wind*.[4] The court also suppressed any statements the appellee made at the Coast Guard station where he and the others were taken after their arrest. The court found a "blatant disregard" of appellee's request to stop the interrogation in the absence of his lawyer, and ruled that any statements made were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■ The district court erred in taking an unduly restrictive view of the authority of Customs officers to search vessels in customs waters in the absence of a border crossing.[5] We hold today that where Customs officers have a reasonable suspicion that Customs violations exist, they may board a vessel to conduct a limited "search" of the non-private areas of the vessel.[6] This authority is constitutionally reasonable without a prior border crossing. Applying

---

**3.** Appellee's codefendants pled guilty to this last charge and are not parties to this appeal.

**4.** The court also found that appellee's statement concerning explosives on the smaller boat was made voluntarily and was sufficiently attenuated from the initial illegality to be purged of any taint therefrom. The admissibility of this statement provided the requisite probable cause and exigent circumstances to justify the warrantless search of the smaller boat. These findings are not before us for review.

**5.** Customs waters are defined, as to an American vessel, as "the waters within four leagues [12 nautical miles] of the coast of the United States." 19 U.S.C. § 1401(j) (1976). It is not disputed that the *Sea Wind* was moored in customs waters.

**6.** This authority is not to be confused with the plenary authority of Customs officers to con-

duct searches at the border in the absence of any suspicion whatsoever, nor with their authority to conduct a document and safety check in customs waters without reasonable suspicion and without evidence that the border has been crossed. See text at 1551–1552, *infra*. The "search" is limited in scope. At a minimum, it allows Customs officers to view those non-private areas of the vessel which are in the plain view of a lawful boarding party. Cf. *United States v. Williams,* 617 F.2d 1063, 1086 (5th Cir.1980) (en banc) (Coast Guard boarding party may, pursuant to 14 U.S.C. § 89(a) (1976), enter hold of a vessel to check mainbeam identification number). This case does not present, and we need not decide, the question how far such a search may extend under 19 U.S.C. § 1581(a) (1976). Cf. *United States v. Williams,* 617 F.2d at 1087 (fourth amendment requires reasonable suspicion that contraband or evidence of criminal activity will be found before Coast Guard may, pursuant to 14

this standard to the present case, we find that Customs officers had ample facts upon which to base a reasonable suspicion that Customs violations existed. The resulting boarding of the *Sea Wind* was thus reasonable under the fourth amendment. Suspicion ripened into probable cause the moment the officers boarded the vessel because they discovered weapons in plain view on the deck of the *Sea Wind*. The combination of probable cause and exigent circumstances present here would have authorized a full search of all areas of the *Sea Wind* at that point. See text 1555–1556 *infra*.

Appellee's statements prior to and during the search are thus not tainted with illegality, and may be used against him. We affirm, however, the district court's ruling that *Miranda* violations occurred during appellee's post-arrest interrogation at Coast Guard headquarters.

## II.

■ Our analysis of the seizure and search of the *Sea Wind* follows the structure set out by the Supreme Court in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Under *Ramsey*, we must first determine if the warrantless seizure or search is authorized by statute. If statutory authorization exists, then we must determine if the seizure or search, as authorized, was reasonable under the fourth amendment.[7] *See United States v. Williams*, 617 F.2d 1063, 1074 (5th Cir. 1980) (en banc).[8]

The government asserts that 19 U.S.C. § 1581(a) authorized the search of the *Sea Wind*. That statute provides in pertinent part:

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters ... and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and ... any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

The plain language of section 1581(a) endows Customs officers with very broad authority to seize and search any vessel and every part thereof at any time without any cause or suspicion whatsoever; this clearly sufficed to authorize the search in question here. We thus proceed to the second part of the *Ramsey* inquiry: whether the search was reasonable under the fourth amendment.

■ The failure of the case law to distinguish among maritime, land, and airplane searches for purposes of determining the reasonableness of those searches has resulted in much confusion in the law of Customs searches. It is of paramount importance to maintain these distinctions, for what is reasonable in a fourth amendment context depends upon the specific facts and circumstances of each case. *Chimel v. California*, 395 U.S. 752, 765, 89 S.Ct. 2034, 2041, 23 L.Ed.2d 685 (1969) (quoting *United States v. Rabinowitz*, 339 U.S. 56, 63, 70 S.Ct. 430, 434, 94 L.Ed. 653 (1950)). We have stated "the principles from automobile, aircraft and boat cases do not necessarily translate literally from their discrete factual settings to the others ...." *United States v. Whitmire*, 595 F.2d 1303, 1307 n. 2 (5th Cir.1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980). Indeed, we have explicitly cautioned that "since a section 1581

---

U.S.C. § 89(a), search private areas of hold of vessel in international waters).

**7.** The fourth amendment provides in relevant part:

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated ....

U.S. Const., amend. IV.

**8.** *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting the case law of the former Fifth Circuit developed before October 1, 1981, as precedent for this circuit).

[maritime] seizure does not require any suspicion of criminal activity, it is clear that land-based 'stop and frisk' law does not necessarily apply to stops of vessels on the seas." *United States v. Williams,* 617 F.2d at 1081.[9]

 The distinction between border searches and other Customs searches has also become muddled, as the district court's ruling evinces. In *United States v. Ramsey,* the Supreme Court pointed out that "[b]order searches . . . have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside." 431 U.S. at 619, 97 S.Ct. at 1980. Therefore, if a crossing of the border is established, a routine search is reasonable without a showing of probable cause. The difficulty in this case arises from the district court's erroneous assumption that a boarding and limited search pursuant to 19 U.S.C. § 1581(a) requires proof of a border crossing to be constitutionally reasonable. Our cases have clearly distinguished between border searches which are reasonable because they occur at the border and limited Customs searches in the maritime context which are reasonable if based on a reasonable suspicion of Customs violations. Limited Customs searches are reasonable under the fourth amendment without a showing of probable cause, although a border crossing has not been proved, because of the diminished expectation of privacy inherent in the maritime setting. Thus such searches do not require proof of a border crossing to establish their fourth amendment reasonableness. We now discuss those cases which establish the

constitutional reasonableness of limited Customs searches in the maritime context.[10]

 In *United States v. Freeman,* 579 F.2d 942 (5th Cir.1978), this court analyzed the authority of Customs officers to detain and board vessels for the limited purposes of making document and safety checks. Drawing upon "[p]recedent, the unique circumstances and problems of the maritime context, and the historical origin of § 1581," *id.* at 946, the court concluded that the seizure and boarding of a vessel to make document and safety inspections in Customs waters is constitutionally reasonable even without reasonable suspicion of Customs violations. *Id.* at 945–47. *Accord United States v. Postal,* 589 F.2d 862, 889 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979). In *United States v. Whitaker,* 592 F.2d 826, 829 (5th Cir.), *cert. denied,* 444 U.S. 950, 100 S.Ct. 422, 62 L.Ed.2d 320 (1979), the court extended the *Freeman-Postal* rule to govern stops that occur within the coast, coastwise of Customs waters, at least concerning vessels initially sighted within Customs waters. The court reasoned:

> The difficulty of policing the ocean frontiers, the impracticality of stopping vessels at a designated point in the water, the brief and routine nature of the detention, and the broad powers historically granted to customs officials—these factors continue to counsel a finding that the officers acted reasonably, and thus constitutionally, in exercising their statutory authority to detain the yacht for a simple document check.

*Id.*[11]

---

**9.** Thus, the broad holding of *United States v. Brennan,* 538 F.2d 711, 716 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977), involving the search of an airplane not at the border, that "neither agents of the Border Patrol nor of the Customs Service may conduct a search on less than probable cause at a point other than the border or its functional equivalent" does not extend to the maritime context.

**10.** Such searches are sometimes called "investigatory stops," a terminology that we avoid because of the inevitable tendency it has to confuse the law governing maritime searches with land-based law governing stops-and-frisks, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and roving border patrol stops, *see United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The searches are limited as indicated in note 6, *supra.*

**11.** See note 13 *infra.*

In *United States v. Whitmire,* 595 F.2d 1303, 1313 (5th Cir.1979), the court had to determine the reasonableness of detention and boarding of vessels when the purposes of Customs officers were more intrusive than mere document and safety inspections. In that case, Customs officers initially sighted a boat inside the shoreline, speeding from an inlet toward an inland waterway. The boat rode heavily in the water, producing an excessive bow wake. The officers testified that during the past year, about 25 similar boats that size producing such a wake had been stopped and found loaded with marijuana. Considering this and other suspicious circumstances, the officers decided to stop the boat to investigate further. However, they were unable to overtake the boat until it was docked on a canal behind the house of one of the appellants. The officers asked the two appellants, then on shore, for their identification and registration papers. One appellant could produce no identification, and the boat registration they had was unsigned and made out to a car company. Still suspicious, one officer boarded the boat while the other watched the two men. The boarding officer instantly smelled a strong odor of marijuana, opened the hatch, and saw large quantities of baled marijuana.

In these circumstances, neither border crossing authority nor section 1581(a) document and safety check authority was available to render the boarding and search reasonable under the fourth amendment. The court undertook a detailed balancing of the interests implicated by boat searches, resisting "the urge to impose uncritically on boat searches the set of standards governing auto searches on our internal highways."

*Whitmire,* 595 F.2d at 1312. The court focused on three factors in determining the reasonableness of a governmental intrusion in the maritime context: (1) the degree of privacy one may reasonably expect, according to the type of vessel and the particular area of it to be searched; (2) the degree of intrusion on protected privacy caused by the specific governmental action; and (3) the governmental interests vindicated by the particular intrusion. *Id.* at 1312–15. It noted that there can hardly be a legitimate expectation of privacy on the open deck of a fishing vessel or in the hold of a hired cargo vessel, *id.* at 1312,[12] and that "[t]he heavy overlay of maritime law and the long practice of regulatory stops, inspections and searches" by Customs officers further diminish the privacy interests of sailors. *Id.* at 1313. It concluded "the fourth amendment allows the boarding of a pleasure craft, sighted initially in intercoastal waters, as to which officers have a reasonable suspicion of a Customs violation—a boarding that occurred after an unsatisfactory document check on shore." *Id.* at 1315–16.

After *Whitmire,* it is clear that "[a] recent nexus to the border is not a prerequisite for an investigatory stop based on reasonable suspicion." *United States v. Castro,* 596 F.2d 674, 676 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979) (citation omitted). Although *Castro* dealt with a vessel observed by Customs officers only in inland waters, its holding applies a fortiori to boardings carried out in Customs waters where the right of Customs officers to board a vessel without a modicum of suspicion in order to conduct document and safety checks further diminishes a sailor's expectation of privacy. Thus, after *Whitmire,* we have sanctioned investiga-

---

12. The en banc court in *United States v. Williams,* 617 F.2d 1063, 1086 (5th Cir.1980) similarly held that, since the Coast Guard can enter the hold of a vessel pursuant to 14 U.S.C. § 89(a) to check the vessel's main-beam identification number while conducting a safety and document check, there can be no "legitimate expectation of privacy with regard to any objects that would be in the plain view (or smell) of a person conducting such an identification check." Thus, limited "searches" pursuant to these maritime statutes are reasonable under the fourth amendment.

tory stops of vessels observed in Customs waters based on reasonable suspicion even though the evidence precluded a finding that the intent of the Customs officers was to make a document and safety check. *United States v. Ruano,* 647 F.2d 577, 579 & n. 5 (5th Cir. Unit B 1981).[13]

Applying these principles to the present case, we conclude that the Customs officers had ample grounds to suspect Customs violations aboard the *Sea Wind* at the time they boarded the vessel. The district court

was correct in ruling that the informant's tip was insufficient to create probable cause under *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969),[14] but erred in neglecting the value of the tip—as corroborated under the circumstances—in giving the Customs officers reasonable suspicion of Customs violations. The standards governing probable cause for a full search must not be confused with those governing investigative boardings and limited searches:

**13.** In *United States v. Villamonte-Marquez,* —— U.S. ——, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Supreme Court held that no suspicion is necessary to stop and board a vessel that is located in waters providing ready access to the open sea to conduct a document inspection pursuant to 19 U.S.C. § 1581(a). The Court also made clear that Customs officers are not precluded from using document check authority simply because they suspect drug smuggling or other illegality on board. —— U.S. at —— n. 3, 103 S.Ct. at 2577 n. 3. However, nothing in that opinion suggests that reasonable suspicion is not required when the Customs officers' conduct, objectively assessed, indicates they did not stop and board the vessel to make a document inspection.

**14.** When the district court ruled on this suppression motion, those cases provided the framework for evaluating the existence of probable cause in relation to informants' tips. *Aguilar,* as explicated in *Spinelli,* set forth a two-part test that an informant's tip—as detailed in an affidavit—must satisfy to create probable cause for a search warrant to issue: (1) the officer's affidavit must set forth some of the underlying circumstances from which the informant drew his conclusion so that a magistrate can independently evaluate the reliability of the manner in which the informant acquired his information; and (2) the affidavit must set forth some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable. *Aguilar,* 378 U.S. at 114, 84 S.Ct. at 1514; *Spinelli,* 393 U.S. at 413, 416, 89 U.S. at 587, 589. In the case before us, the government consistently objected to any cross-examination of the FBI agent who received the tip and interviewed the informant that would have explored the basis either for the informant's knowledge or the agent's belief in the informant's credibility and reliability. The court erroneously sustained most of these objections on the grounds of irrelevancy and inquiry beyond the scope of direct examination. For ex-

ample, when counsel for the appellee explained to the court "I want to know what the story was that the tipster told him [the FBI agent] and whether or not that was a credible story[,]" the court sustained the government's objection that this inquiry was beyond the scope of direct examination. The tip in this case could not meet the *Aguilar-Spinelli* standards for creating probable cause, because the government prevented inquiry critical to the satisfaction of those standards.

Subsequent to our taking this case under submission, the Supreme Court decided *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates,* the Court rejected the dominant interpretation of *Aguilar-Spinelli:* that their prongs set up a two-part test for probable cause, both of which must be independently satisfied. Henceforth, the task of the magistrate passing on probable cause is simply to make a practical, common-sense decision whether, under the totality of the circumstances before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. —— U.S. at ——, 103 S.Ct. at 2332. However, the Court emphasized throughout its opinion that "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant in determining the value of his report." —— U.S. at ——, 103 S.Ct. at 2327; *see* —— U.S. at ——, —— & n. 11, 103 S.Ct. at 2329, 2332 & n. 11.

We cannot apply the probable cause standard explicated in *Gates* to the present case because the district court erroneously shut off inquiry into these critical areas. After full exploration of the relevant areas on remand, the district court might well find probable cause under the totality of the circumstances present. However, it is unnecessary to remand this case to the district court to make that determination because, as indicated in the text, *infra,* the Customs officers' reasonable suspicion of Customs violations authorized their subsequent actions.

"[n]either the tests of reliability demanded for a showing of probable cause nor, indeed, a showing of probable cause is required to justify an investigative stop." *United States v. Rollerson,* 491 F.2d 1209, 1211 (5th Cir.1974). The Supreme Court's analysis in upholding an investigatory stop-and-frisk based on a tip incapable of meeting the *Aguilar-Spinelli* requirements is instructive:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . The informant here came forward personally to give information that was immediately verifiable at the scene. Indeed, under Connecticut law, the informant might have been subject to immediate arrest for making a false complaint had [subsequent] investigation proved the tip incorrect. Thus, while the Court's decisions indicate that this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant, [citing *Aguilar* and *Spinelli*], the information carried enough indicia of reliability to justify the officer's forcible stop of Williams.

*Adams v. Williams,* 407 U.S. 143, 145–47, 92 S.Ct. 1921, 1923–24, 32 L.Ed.2d 612 (1972) (footnote omitted).

■ As in *Adams,* in this case the informant came forward and met with FBI agents personally to provide information.

He thus exposed himself to prosecution under 18 U.S.C. § 1001 (1976),[15] for making false statements in a matter within the jurisdiction of a United States agency. Moreover, the agents' independent observations partially corroborated the informant's tip. They observed a boat matching the description given them being towed to a location in the Florida Keys and being placed near a larger boat moored in the water. They also observed a group of men moving back and forth between the towed boat and the larger boat, and saw two individuals transport long, light-colored packages of a size that might have contained weapons from the smaller boat to the larger boat. Finally, Customs officer Hoversen testified that his observation that seven people had constricted themselves on a small, 28-foot vessel late at night aroused his suspicions. He believed that they must have been ready to "depart for someplace."[16] Viewing this case from the perspective of the "totality of the particular circumstances" known to the officers, *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 n. 10, 95 S.Ct. 2574, 2582 n. 10, 45 L.Ed.2d 607 (1975), including the propaganda about Plan Maximo Gomez circulating at the time, we have no doubt that the officers possessed sufficient articulable facts, taken together with reasonable inferences from those facts, to support a reasonable suspicion of Customs violations, i.e., the illegal exportation of firearms.[17]

■ Possessing reasonable suspicion of a Customs violation, the Customs officers, ac-

---

15. 18 U.S.C. § 1001 (1976) provides in pertinent part: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false, fictitious or fraudulent statements or representations . . . shall be [punished]."

16. Thus, this case is readily distinguishable from *United States v. Williams,* 544 F.2d 807 (5th Cir.1977). *Williams* involved a customs search of a 26-foot raft bearing two plastic domes of sufficient size to serve as living quarters, attached to an 18-foot motorboat. The vessel was moored at a marina four miles from the Gulf of Mexico. The vessel was small and probably unseaworthy, and the record did not show that the boat was even capable of ventur-

ing into international waters. 544 F.2d at 811. Under these circumstances, the court held that the Customs officers lacked a reasonable suspicion that the boat fell into Customs' area of concern, or that a violation of the law was being committed on board. In the facts and circumstances of the present case, we can attribute no significance to the fact that the *Sea Wind* was moored at the time of the boarding, instead of moving five feet from the dock.

17. Unlicensed exportation of weapons and explosives, and their use against a foreign government with which the United States is at peace, violate an array of criminal statutes and regulations. *See, e.g.,* 22 U.S.C. § 2778 (1976 & Supp. V 1981), as specified in 22 C.F.R. § 121.-01(a) (1982) and 22 C.F.R. § 127.01(a) (1982)

companied by FBI agents, were entitled to board the vessel to investigate their suspicions. We need not address here the permissible scope of the search authorized by section 1581(a), for there is no claim that Customs officials intruded upon any private area of the vessel. There can be no reasonable expectation of privacy concerning the open deck of a vessel subject to a valid investigatory boarding under section 1581(a). See note 12 *supra* and accompanying text.

■ Once aboard the vessel, Customs officer Hoversen "immediately saw the barrels of rifles or rifle-type weapons ... by the cabin door of the boat." At that point, reasonable suspicion of Customs violations became probable cause to believe crime was being committed. Every detail of the informant's tip had been corroborated except one: that the vessel would leave for Cuba in order to use the weapons. Agents observed a 14 foot, red and white vessel move into the predicted area; saw weapons-sized packages being moved from that vessel to a larger vessel moored in the water, as predicted; observed seven individuals crowded into the 28 foot vessel late at night; and confirmed that rifles had been moved aboard that vessel.

Having verified every facet of the information given them by their informant except for the fact that the vessel would leave for Cuba, the Customs officers and FBI agents "had 'reasonable grounds' to believe that the remaining unverified bit of [the informant's] information ... was likewise true." *Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959). The informant's tip, inadequate to establish probable cause standing alone, had been buttressed by both types of corroboration permitted in this circuit: "independent observation substantiating the details of the tip" and "independent observations of activity reasonably arousing suspicion itself." *United States v. Brand,* 556 F.2d 1312, 1318 (5th Cir.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1237, 55 L.Ed.2d 763 (1978). The Customs officers thus possessed probable cause for the subsequent stem-to-stern search of the *Sea Wind.*[18] Furthermore, because "exigence is to be determined as of the time of seizure," *United States v. Mitchell,* 538 F.2d 1230, 1232 (5th Cir.1976) (en banc), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977), exigent circumstances, if such were required, existed in the form of a vessel laden with arms and possibly explosives.

■ Having determined that the seizure and search of the *Sea Wind* was permissible under the fourth amendment, it follows that the district court's suppression of various statements the appellee made prior to and during the search cannot be supported on the ground that the statements were the fruits of an illegal search. Nor do the strictures of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) apply to any of these statements. Concerning appellee's response to the inquiry of Customs officers that he was "in charge" of the *Sea Wind,* we have held: "*Miranda* warnings are unnecessary during routine questioning and searches by customs agents and during a routine boarding and inspection of an American vessel on the high seas by the Coast Guard." *United States v. Henry,* 604 F.2d 908, 915 (5th Cir.1979) (ci-

---

(criminalizing attempts to export firearms without a license); 18 U.S.C. § 956 (1976) (conspiracy to destroy property of a foreign government with which the United States is at peace); 18 U.S.C. § 960 (1976) (preparing or taking part in a military expedition against any foreign state with which the United States is at peace). There is no doubt that the Customs Service has the power to enforce laws governing the export of firearms. *See* 19 C.F.R. § 161.2(a)(1).

18. We thus need not decide the question reserved in *United States v. Whitmire,* 595 F.2d 1303, 1315 (5th Cir.1979) and *United States v. Williams,* 617 F.2d 1063, 1088 n. 30 (5th Cir. 1980) (en banc): whether more intrusive § 1581(a) Customs searches of vessels about which there is no proof of a border crossing may be predicated on some lesser standard.

tations omitted). Concerning his statement that "there are guns aboard [the *Sea Wind*]; they'll eventually be found," there is no evidence in the record that this statement was the product of coercive, custodial interrogation; the record on this point, although sparse, indicates only that appellee volunteered this statement after being removed from the vessel. Indeed, FBI agent Briones testified that no questions had been directed to appellee prior to his being transported to a Coast Guard station and advised of his rights. Absent custodial interrogation at the time the statement was volunteered, *Miranda* furnishes no grounds for the suppression of this statement. *See Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. Thus, the district court erred in excluding these statements.

■ The court also suppressed any statements by appellee "given at the Coast Guard station subsequent to the time of his *Miranda* warnings." The court held that questioning continued after appellee requested an attorney, and that the blatant disregard of this request violated the strictures of *Miranda.* Although the court explicitly stated that "the testimony is basically not in conflict between the FBI witness and the defendant," the government argues on appeal that there was a conflict in the testimony concerning when appellee requested an attorney, which conflict the district court erroneously failed to resolve.

Under *Miranda,* when an accused subject to custodial interrogation asks for the assistance of counsel "the interrogation must cease until an attorney is present." *Miranda v. Arizona,* 384 U.S. at 474, 86 S.Ct. at 1628. This is a "rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2569, 61 L.Ed.2d 197 (1979). In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police.

451 U.S. at 484–85, 101 S.Ct. at 1884–85 (footnote omitted).

The record in this case fully supports the district court's conclusion that custodial interrogation continued after appellee's request for counsel, and that there was no valid waiver of that right. The appellee stated that he had asked for a lawyer twice, once at the beginning of the questioning and a second time about half-way through the questioning. Agent Briones conceded on cross-examination that the appellee did ask for a lawyer several times, and that he continued his questioning because a lawyer was not available. There was no conflict in the testimony on that point. Thus, the district court correctly suppressed these statements.

In sum, we reverse the district court's suppression of the physical evidence seized from the *Sea Wind* and appellee's statements made prior to and during the search. We affirm the suppression of appellee's responses to inquiries at the Coast Guard station pursued in violation of his *Miranda* rights.

AFFIRMED in part; REVERSED in part and REMANDED.

HATCHETT, Circuit Judge, concurring specially.

I join in the judgment in this case because the teachings of *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527, require reversal of the trial court's sup-

pression of the physical evidence seized from the *Sea Wind* and the statements made during the search.