UNITED STATES of America, Plaintiff

v.

Juan GARCIA and Rene Cuesta-Acosta, Defendants.

No. 84-329 CR EBD.

United States District Court, S.D. Florida.

Oct. 26, 1984.

534

Steven Golembe, Miami, Fla., for Juan Garcia.

Randolph Q. Ferguson, Miami, Fla., for Rene Cuesta-Acosta.

David A. Doheny, Miami, Fla., for the United States.

## ORDER GRANTING MOTION TO SUPPRESS AS TO JUAN GARCIA AND DENYING IT AS TO RENE CUESTA-ACOSTA

EDWARD B. DAVIS, District Judge.

THIS MATTER is before the court upon motion of defendants, Juan Garcia and Rene Cuesta-Acosta, to suppress evidence seized by United States Customs Patrol Officers from a boat off the coast of Florida. The court GRANTS the motion to suppress as to the captain of the vessel, Juan Garcia, but finds no standing and DENIES the motion as to the crew member, Rene Cuesta-Acosta.

### FACTS

The following facts are based upon what the court believes to be the credible testimony of the Government's only witness, United States Customs Patrol Officer Dale Kestler.

On May 8, 1984, officers aboard an unmarked United States Customs Patrol boat spotted a small fishing or pleasure vessel coming northwest toward them from south of Cape Florida into Biscayne Bay. After the vessel passed, they decided to follow it. They noticed heavy salt spray on the vessel and they pulled alongside and asked the defendants where they were coming from and whether they had any weapons. De-

fendant Garcia replied that they were fishing and had no weapons.

Three officers boarded the vessel for a documentation and safety check. Defendant Garcia, who was operating the vessel, produced proper documentation from his wallet. In the meantime, two of the officers began a "preliminary search." Their suspicions were aroused by the following factors. There were no rods, reels or bait on the boat—just a few hand fishing lines. A look in the ice chest revealed frozen, not fresh fish. There was enough food and clothing aboard for an outing of several days. They found small, infrared lights which might have been used to vector planes in. Defendant Garcia had heavy salt spray on his glasses, and defendant Cuesta-Acosta was shaking nervously.

The officers proceeded to search the vessel for half an hour. One further item aroused their suspicion. There was a three-inch diameter hole cut in the main cabin floor covered with a filler cap. Removal of the cap revealed sawdust, but the crevice was otherwise empty. Officer Kestler testified that he did not know what the hole was used for, but that its purpose might have been to fill fuel or water tanks.

Having found no contraband after a half-hour search, the officers still felt suspicious and decided to bring the vessel into a customs dock at Miami, two miles away. There they went over what they had searched before more carefully, still finding nothing. Before letting the boat go, they decided to check behind the refrigerator, a common place to hide contraband. New shiny screws came out easily and removal of the refrigerator revealed an opening in which marijuana was concealed. Further searching uncovered a total of 199 pounds of marijuana. Defendants were charged with conspiracy to violate and violation of 21 U.S.C. § 955a(a), possession with intent to distribute a controlled substance.

Before proceeding to discuss the legal implications of the foregoing event, it is necessary to take note of an additional aspect of Officer Kestler's testimony. When first sighted, the suspect vessel was heading west toward land but was not outside United States coastal waters. Officer Kestler testified that when they first saw the vessel, they had no reason to believe that the vessel came from "outside", and that it was "just a hunch" that caused them to follow it. He said that the heavy salt spray might have meant it came from the outside, but it might not have. The westward direction might have meant it came from outside, but it was entirely consistent with a trip up from Key Largo. Furthermore, the search revealed no evidence of any connection with outside of the United States. He said that while he was not positive that the vessel came from "outside", he found that to be irrelevant. The officers stopped the boat for a documentation and safety check.

### OPINION

**I. The Search Was Not Valid as a Border Search**

 That this was a documentation and safety check and not a search incident to a border crossing is the first important step in the Court's analysis. When the United States border is crossed, the power of customs officials to search is plenary. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). In the maritime context, this has been held to mean that any crossing from international waters into the contiguous zone (an imaginary line 12 miles from the United States shore) gives customs officials border search authority. *United States v. Hidalgo-Gato*, 703 F.2d 1267 (11th Cir.1983). To invoke this border search authority, there must be some degree of probability that a border crossing has been made. *United States v. Whitmire*, 595 F.2d 1303, 1307 (5th Cir.1979). While it has been established that customs officials need not actually observe the vessel as it crosses the imaginary line, the exact degree of probability required is not clearly established. *Id.* at 1307 n. 2 (discussion and citations). There must at least be some articulable facts from which it is reasonable to infer

that there was a recent border crossing. *Id.; see also United States v. Acosta,* 489 F.Supp. 61, 63–4 (S.D.Fla.1980); *United States v. Helms,* 703 F.2d 759, 763–4 (4th Cir.1983); *United States v. Laughman,* 618 F.2d 1067, 1072 n. 2 (4th Cir.1980).

■ The court concludes that in the instant case it was not reasonable to infer that there had been a recent border crossing. The only evidence of a border crossing was the heavy salt spray and westward direction of the vessel. Officer Kestler candidly testified that while this could indicate a border crossing, because the immediate area was calm, it was entirely possible that the vessel had come from a point south, within United States waters. He had no reason to believe that the vessel had come from "outside". Indeed, Officer Kestler felt that was irrelevant, and asserted that they approached for a documentation check, just on a "hunch". In addition, an extensive search revealed no additional evidence of a border crossing. The court finds that Officer Kestler did not believe,[1] nor was it reasonable to infer, that a border crossing had been made. Thus, plenary border crossing authority to search is absent.

**II. The Captain, Juan Garcia, Has Standing to Object to the Search; The Crew Member, Rene Cuesta-Acosta, Does Not.**

■ In order to object to the introduction of evidence which is the product of an illegal search, a defendant must have some legitimate expectation of privacy in the area searched. *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). This legitimate expectation of privacy in the premises may be shown through ownership, leasing, or unrestricted right of occupancy or custody or control. *United States v. Bachner,* 706 F.2d 1121 (11th Cir.1983). The court finds that Juan Garcia was the captain of the vessel, because

he was controlling the boat, he communicated with the officers, and he produced proper documentation. Though he was not the owner, he did have an unrestricted right of custody or control, and thus had a legitimate expectation of privacy. *See also United States v. Hernandez,* 668 F.2d 824 (5th Cir.1982) ("lawful possession").

It is true that no legitimate expectation of privacy exists in public areas of the boat and those areas which customs officials may visit as part of a routine document and safety inspection. *United States v. Williams,* 617 F.2d 1063, 1086 (5th Cir.1980). However, the area behind a refrigerator which is screwed in to the wall is not within plain view, and thus is not to be summarily removed from the ambit of Fourth Amendment protection. *See United States v. Whitaker,* 592 F.2d 826, 830 (5th Cir.1979) (a legitimate expectation of privacy may attach to a locked compartment on the bridge). The court finds standing for the captain to assert the substantive Fourth Amendment claim. *See infra.*

Rene Cuesta-Acosta, however, was merely a crew member. He had no right to custody or control. There are areas of a boat in which a crew member might have a legitimate expectation of privacy, such as a locked footlocker or private living quarters, *Id; United States v. DeWeese,* 632 F.2d 1267, 1271 (5th Cir.1980), but a mere crew member has no privacy interest in other areas of the boat. *United States v. Williams,* 617 F.2d 1063, 1084 (5th Cir.1980). The court denies Cuesta-Acosta standing to challenge the search.

**III. The Officers Acted Properly in Boarding and Inspecting the Vessel; However, Once Aboard, Their Suspicions Failed to Ripen Into Probable Cause and an Extended Search was Therefore Unreasonable Under the Fourth Amendment.**

■ Customs officers have authority to stop and board vessels under two separate doctrines. First, officers may perform a

---

**1.** Officer Kestler testified on cross-examination that he did not discuss with his fellow officers any grounds for belief that the vessel came from "outside". Because he was the only witness the Government presented, this court only has his version of the event to rely upon, and cannot hypothesize as to factors his fellow officers may have relied upon.

limited investigatory stop if they have a reasonable suspicion of customs violations. 19 U.S.C. § 1581(a); *United States v. Herrera,* 711 F.2d 1546 (11th Cir.1983). Second, customs officers may board for a documentation and safety check absent any suspicion at all. 19 U.S.C. § 1581(a); *United States v. Villamonte-Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). In addition, the Supreme Court refused to preclude the use of document and safety check authority simply because the officers may have suspected illegal activity. *Id.* 103 S.Ct. at 2577 n. 3; *Herrera* at 1554 n. 13. Thus, in the instant case the court finds the initial boarding by the officers to be entirely reasonable under the Fourth Amendment as interpreted by the courts.

However, the key element in approval of investigatory or document and safety check stops in the cases that have approved them is that they are *limited.* Justice Rehnquist, speaking for the Supreme Court in *Villamonte-Marquez,* pointed out that documentation and safety checks were reasonable within the meaning of the Fourth Amendment because they "involve only a brief detention where officials come on board, visit public areas of the vessel, and inspect documents. 'Neither the [vessel] nor its occupants are searched, and visual inspection of the [vessel] is limited to what can be seen without a search.'" 103 S.Ct. at 2581 (citations omitted). The Eleventh Circuit pointed out in *Herrera* that the reasonable suspicion required for an investigatory stop "must not be confused" with the standard governing a full search. 711 F.2d at 1554.

■ Once properly aboard a vessel, officers are given a considerable opportunity to detect illegal activity. They may visit public areas of the boat and observe anything in plain view. They may enter the hold to check the main-beam identification number, and again may observe anything in plain view. *United States v. Odom,* 526 F.2d 339 (5th Cir.1976). If the door to the main hold is locked, they may properly break it open. *United States v. Thompson,* 710 F.2d 1500 (11th Cir.1983). Fur-

ther, if a cabin is used for multiple purposes, the fact that one of its uses is private, i.e. it serves as living quarters, does not shield it from the legitimate scope of a safety inspection. *Id.* at 1506–7.

■ As can be seen from the foregoing discussion, the case law has evolved to give law enforcement officers a considerable degree of leeway in inspecting vessels at sea. The case law has, however, placed a distinct limit upon the scope of these inspections. Once properly aboard a vessel, officers cannot conduct an exhaustive search unless by the time their limited inspection is complete their suspicions have ripened into probable cause. *United States v. Andreu,* 715 F.2d 1497, 1500 (11th Cir.1983); *United States v. Herrera,* 711 F.2d 1546, 1556 (11th Cir.1983); *United States v. Gollwitzer,* 697 F.2d 1357, 1362 (11th Cir. 1983); *United States v. Gray,* 659 F.2d 1296, 1299 (5th Cir.1981); *United States v. D'Antignac,* 628 F.2d 428, 434 (5th Cir. 1980); *United States v. Kleinschmidt,* 596 F.2d 133, 136 (5th Cir.1979); *United States v. Whitmire,* 595 F.2d 1303, 1308 (5th Cir. 1979).

In *Kleinschmidt,* the court approved of the initial boarding as an investigatory stop, but said, "once on board, a further search could be constitutionally validated only by the existence of probable cause..." 596 F.2d at 136 (citations omitted). The odor of marijuana on board provided probable cause for a search. *Id. See also United States v. Whitmire,* 595 F.2d 1303, 1308 (5th Cir.1979).

*United States v. Andreu,* 715 F.2d 1497 (11th Cir.1983) is similar to the instant case. There was heavy salt spray on the windshield. There were facts inconsistent with a purported fishing trip, such as extra clothing. Factors not present in the instant case included the fact that the vessel was riding low in the water and appeared to have no access to storage space. All of this, the court held, added up to the reasonable suspicion necessary to board and conduct an initial search. However, in order to approve of the officers cutting a hole in the deck to search for contraband, the

court found that probable cause arose because the officers smelled marijuana and found marijuana seeds on the deck. This justified a full search.

 In the instant case, the officers observed heavy salt spray, sparse fishing equipment, frozen fish, and a nervous crew member. All of these were inconsistent with a fishing trip. The officers also observed more clothing and food than would be necessary for a fishing trip, although Officer Kestler did note that the trip from Bimini (a most likely launching point for a drug run) only takes a number of hours, so the extra food and clothing would be unnecessary. In any case, this court approves of the boarding and initial search either as justified by reasonable suspicion or as a document and safety check.

The crucial element, missing in this case, but present in the long list of cases cited above, is the lack of any direct evidence pointing toward contraband. After a full half hour of searching, the officers neither saw nor smelled marijuana or its accompanying seeds. A check in a suspicious hole in the floor of the cabin revealed nothing. Reasonable suspicion existed; probable cause did not. The court finds that removing a refrigerator which is screwed in to the wall is similar to cutting a hole in the deck, for which *Andreu* required probable cause.

Perhaps the real issue in this case is whether there is any limit upon the permissible scope of government policing activity at sea. The court is painfully aware of the difficulty of policing our shores given the relentless onslaught of drug trafficking. Because of the problems involved, police authority at sea has historically been construed broadly. *See United States v. Williams*, 617 F.2d 1063 (5th Cir.1980). But Fourth Amendment analysis has always balanced the government interest against the degree of intrusion on individual privacy. Considering that precedent has not completely removed the maritime setting from the purview of Fourth Amendment protection, the court finds that the instant situation, in which a half hour search which

revealed nothing was followed by a trip to the customs dock and continued detention of the boat's occupants, must be held to be unreasonable.

Accordingly, it is hereby

ORDERED and ADJUDGED that the Motion to Suppress is GRANTED as to Defendant Juan Garcia and DENIED as to Defendant Rene Cuesta-Acosta.