**UNITED STATES of America, Plaintiff,**

v.

**John CREWS and Hewitt Gaynor McGill, a/k/a Douglas J. Russel, Defendants.**

**No. 84–246 CR EBD.**

United States District Court, S.D. Florida.

Feb. 20, 1985.

Helen Forsyth, Asst. U.S. Atty., Miami, Fla., for plaintiff.

Paul A. McKenna, Asst. Federal Public Defender, Miami, Fla., Michael G. Smith, Fort Lauderdale, Fla., for defendants.

## ORDER DENYING MOTIONS TO DISMISS AND TO SUPPRESS

EDWARD B. DAVIS, District Judge.

THIS MATTER is before the Court upon Defendant's Motions to Dismiss and Suppress. The Court held a hearing at which the parties presented witnesses and documentary evidence. For the reasons discussed below, it is hereby

ORDERED AND ADJUDGED that the Motions are DENIED.

### FACTS

On Saturday, March 31, 1984, in international waters in the Windward Passage between Haiti and Cuba, United States Coast Guard Cutter "Gallatin" sighted and made radio contact with the sailboat "Chinook". The Chinook was flying a Canadian flag but no home port was shown on the hull.

The Gallatin communicated with the Chinook by radio. The response indicated Canadian registration, a home port of Key West and the presence of two United States citizens on board. Pursuant to what the Coast Guard officers characterized at the hearing as a documentation boarding, the Gallatin requested, and received, consent to board. (Once aboard, the officers also made it clear that they would leave if asked to.) The boarding party brought with it cigarettes, water and a medical ointment, as requested by the Chinook.

Lieutenant Peter J. Bergeron testified that as the officers were boarding the Chinook, he observed one of the defendants throw a bag of white powder over the side. When questioned, the defendants said it was sugar. Next, the officers received permission from the defendants to do a space check of the boat. That check revealed unaccounted for space, but when the Defendants denied permission, the officers did not attempt to gain access to that space.

A number of further facts and circumstances raised the officers' suspicions. While Defendant McGill did show a Canadian registration document, neither of the Defendants had proper identification—Defendants asserted that their identifications had fallen over the side. There was a radar fuzzbuster aboard, which the officers felt was odd for a pleasure craft. A removable name plate on the stern was all that indicated the boat's name. The boat had been modified from two masts to one, and there was no access from the foredeck to the space which should have contained the chain locker. Additionally, the forward cushions had been cut down to conform to a new bow.

The Gallatin radioed the Coast Guard office in New Orleans to check their EPIC computer system to see if there was any information regarding the boat or its crew. The check revealed that the Chinook was suspected of smuggling cocaine. McGill had been suspected of smuggling since 1975, including suspicion of running narcotics from Jamaica to the United States in 1979. Crews had been arrested in Colombia in 1983 for possession of marijuana.

The officers informed the Defendants that they were contacting the Canadian government to request permission to search the boat. Defendants told the officers that if they did not get permission by 10 o'clock on the morning of April 1, they would be asked to leave. The permission was not forthcoming by that time, and the officers left the Chinook.

The Coast Guard, communicating through the State Department and the United States embassy in Ottawa, requested the permission of the Canadian government to board and search the vessel, and if contraband was found, to arrest the crew and seek prosecution under United States law. The communication further requested that the Government of Canada (GOC) make a choice: either (1) have the Coast Guard seize the vessel, take it to a U.S. port and institute forfeiture proceedings against it; or (2) seize the vessel on behalf of the GOC, take it to a U.S. port, and hold it for future action by the GOC.

The GOC's response, which was received by the Gallatin on Sunday, April 1, at approximately 7:30 P.M., provided as follows:

A. IT IS NOT CLEAR IF THE CHINOOK IS A CANADIAN REGISTERED VESSEL.

B. IF IT IS A CANADIAN SHIP, CANADIAN AUTHORITIES HAVE NO OBJECTION TO THE U.S. AUTHORITIES BOARDING THE SHIP BASED ON THE UNDERSTANDING THAT THE U.S. AUTHORITIES:

1. HAVE REASONABLE GROUNDS TO BELIEVE THE CHINOOK IS ENGAGED IN ILLICIT TRAFFIC OF NARCOTIC DRUGS.

2. USE ONLY SUCH FORCE AS MAY BE REASONABLY REQUIRED TO BOARD OR TAKE OVER SHIP.

C. THE GOC PREFERS OPTION A, THAT THE SHIP, CARGO AND CREW BE DEALT WITH IN ACCORDANCE WITH U.S. LAW.

At approximately 8:00 p.m., acting in reliance on the message from the Government of Canada, the Gallatin crew made a second boarding of the Chinook. The officers pulled out molding and removed carpeting, and found a hole which led below.

The vessel's cargo consisted of approximately 1,900 pounds of cocaine. Defendants were charged with conspiracy to violate and violation of 21 U.S.C. Sec. 955a(b), which makes it unlawful for any citizen of the United States on board any vessel to intentionally possess with intent to distribute a controlled substance.

## OPINION

### I. Motion to Dismiss

■■■ Defendants' Motion to Dismiss is based on two grounds, both of which the Court rejects. First, defendants contend that the United States lacks jurisdiction over criminal conduct performed outside its territory, in this case on a foreign vessel on the high seas, absent some nexus between the United States and the criminal conduct. While this may be an accurate statement of the law where foreign nationals are involved, it does not apply to a statute which refers to United States citizens "on board any vessel." As a matter of international law [1], any country may exercise its jurisdiction to prescribe, i.e., it may apply its body of law, to its citizens anywhere in the world. [2] See, e.g., Skiriotes v. Florida, 313 U.S. 69, 73, 61 S.Ct. 924, 927, 85 L.Ed. 1193 (1941) ("the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas or even in foreign countries when the rights of other nations or their nationals are not infringed."); see also Restatement (Second) of Foreign Relations Law, Sec. 30 (1965).

■■■ The issue then becomes whether Congress intended to exercise its extraterritorial jurisdiction. [3] Regarding this statute, 21 U.S.C. Sec. 955a(b), Congress' intent to exercise its extraterritorial jurisdiction is

---

1. International law is incorporated into the law of the United States. See The Paquete Habana, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900).

2. While the United States may exercise its jurisdiction to prescribe over its own citizens anywhere in the world, it does not have jurisdiction to enforce its laws on another country's sovereign territory (in this case a Canadian flag vessel, which is considered a floating piece of territory), absent the foreign sovereign's permission. The issue is addressed in the Court's discussion of the motion to suppress. See infra.

3. See generally NEPA's Role in Protecting the World Environment, 131 U.Pa.L.Rev. 353 (1982).

plain, because it applies to citizens of the United States aboard "any vessel," which includes those flying foreign flags. *United States v. Kaercher*, 720 F.2d 5 (1st Cir.1983), held that Congress did intend to apply this law to United States citizens aboard foreign vessels on the high seas, and that this exercise of jurisdiction comports with international law.

▆▆▆ Defendants' second ground for the Motion to Dismiss asserts that the indictment fails to state where the alleged offense took place, and that this defect is fatal.[4] It is true that the indictment does not specify the exact location of the Chinook on the high seas when it was seized. However, as the Government points out, the indictment does specify that the offenses took place aboard the vessel Chinook. An indictment need not specify the exact location of the offense, but rather must be sufficiently specific to allege that the crime was committed within the jurisdiction of the court. *See* Wright & Miller, *Federal Practice and Procedure*, Sec. 125 (1982). Because the statute in question, 21 U.S.C. Sec. 955a(b), applies to United States citizens aboard any vessel, the indictment is sufficiently specific to properly allege jurisdiction. In addition, the indictment says that Opa Locka, Florida, was the first place to which the defendants were brought. For crimes committed on the high seas, venue properly lies in the district to which the defendants are first brought. 21 U.S.C. Sec. 955a(f); *United States v. Liles*, 670 F.2d 989 (11th Cir.), *cert. den.*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982). Thus, the Court finds that the indictment sufficiently alleges proper jurisdiction and venue, and the motion to dismiss must be denied.

## II. *Motion to Suppress*

Defendants challenge the search and seizure of the Chinook that has been referred to as the second boarding, on April 1, 1984 at about 8:00 p.m., maintaining that (1) it was not authorized by the Canadian government because the permission granted was conditioned on Canadian registry, which was not verified until later; and (2) it violated the Fourth Amendment because it was done without reasonable articulable suspicion or probable cause.

### A. *The Initial Boarding Was Valid Because Defendants Consented to it.*

▆▆▆ As a preliminary matter, the Court takes note of the legality of the initial boarding. The Coast Guard officers described the initial boarding as a documentation boarding. The Coast Guard has authority to stop and board *American* vessels on the high seas for documentation and safety inspections, without any sort of articulable suspicion, under 14 U.S.C. Sec. 89(a). *United States v. Thompson*, 710 F.2d 1500, 1504 (11th Cir.1983). With a foreign vessel, however, the Coast Guard may only order it to stop if there is reasonable suspicion of criminal activity in violation of United States law. *United States v. Glen-Archila*, 677 F.2d 809, 813 (11th Cir.1982); *United States v. Williams*, 617 F.2d 1063, 1076 (5th Cir.1980) (en banc). This is to protect the sovereign interests of the flag country.

▆▆▆ In this case, there was no evidence presented of any facts creating reasonable suspicion prior to the initial boarding. Thus, the officers' characterization of the boarding of the Chinook as a documentation boarding does not of itself allow the seizure to pass muster under international law. However, the concern for violation of the sovereign rights of the flag country is vitiated in this case by defendants' free consent to the boarding. In response to the Coast Guard's boarding request, defendants replied, "Sure, come on over," and requested cigarettes and water. The Court finds this consent sufficient to make the initial boarding legal. *Accord, United*

---

**4.** The indictment reads, in pertinent part, "... while aboard the vessel Chinook with Opa-Locka, in the Southern District of Florida, being the first place to which the defendants were brought ..."

*States v. Sainsbury-Suarez,* Case No. 84–005–Cr–ALH (S.D.Fla. June 8, 1984).

### B. The Second Boarding Was Made Pursuant To A Valid Grant Of Permission From the Government of Canada.

■ As discussed above, the United States has jurisdiction, under international law, to prescribe rules of law that apply to its nationals, wherever in the world they may be. However, the United States does not have jurisdiction to enforce its laws, *i.e.,* to take measures directed toward compliance, on another nation's sovereign territory, absent consent by the other nation. *See, e.g., F.T.C. v. Compagnie de Saint-Gobain-Pont-A-Mousson,* 636 F.2d 1300, 1315–17 (D.C.Cir.1980); *Restatement (Second) of Foreign Relations Law,* Sec. 7 and Sec. 44 (1965). A vessel on the high seas is considered to be a floating part of the flag nation's sovereign territory,[5] so consent of the foreign sovereign is necessary.

In this case, the necessary consent was obtained from Canada. Defendants attack the validity of the Canadian consent statement, as applied to the situation involved. First, the Defendants point out that the Canadian consent message (quoted *infra* in the FACTS section) said that it was not clear whether the Chinook was a Canadian vessel, and if it was in fact a Canadian vessel, the Canadian government had no objection to the boarding. This, Defendants maintain, means that the consent was conditioned on the Canadian government's verification of registry, and the consent would not become active until that condition was fulfilled.

■ The Court does not agree. It is true that the Canadian government had not yet verified registry. But the consent statement did not explicitly order the United States officers to await that verification. Rather, it simply stated that "if it is a

Canadian ship, Canadian authorities have no objection to the U.S. authorities boarding the ship ..." The fact that it was a Canadian vessel was verified by the Coast Guard officers through observation of the Canadian flag, defendants' statement that it was a Canadian-registered ship, and the registration documents which were presented. Thus, in the minds of the Coast Guard officers, the condition to boarding was satisfied. And, in fact, an "Aide-Memoire" from the Canadian government was introduced into evidence which showed that the Canadians verified the Chinook's Canadian registry the following day (April 2). The Court finds that the Canadians' condition, that the vessel be in fact Canadian, was satisfied.

■ A second condition in the Canadian consent message was "that the U.S. authorities have reasonable grounds to believe the Chinook is engaged in illicit traffic in narcotic drugs." While the Court does not know what the Canadians consider to be "reasonable grounds," the Court finds that the Coast Guard officers had probable cause to believe the vessel contained contraband (see discussion below of the Fourth Amendment issues), and believes that this is more than adequate to constitute "reasonable grounds."

■ Defendants' final argument regarding the consent statement is that the Canadians consented only to a boarding, not a complete search. The statement does say that "if it is a Canadian ship, Canadian authorities have no objection to the U.S. authorities *boarding* the ship." But the statement also says that "the GOC prefers ... that the ship, cargo and crew be dealt with in accordance with U.S. law." The Government of Canada is well aware that when United States Coast Guard officers "deal with" vessels suspected of smuggling under U.S. law, they fully search the vessel for contraband. This awareness was sure-

---

**5.** The accuracy of characterization of a vessel on the high seas as a floating piece of territory has been questioned, especially regarding the situation of concurrent jurisdiction which arises when a flag vessel is located in the territorial waters of another state. However, the characterization holds strong regarding jurisdiction to enforce aboard another nation's sovereign flag vessel when it is on the high seas.

ly heightened by the fact that the Coast Guard's message requested permission to "completely search the vessel." In addition, it is obviously not possible for U.S. authorities to deal with the cargo contained in a suspected smuggling vessel "in accordance with U.S. law," unless they first search for and find contraband. Thus, viewing the statement as a whole, the Court finds that the Canadian consent to a "boarding" was in fact consent to a boarding and search.

### C. The Second Boarding Did Not Violate The Fourth Amendment's Prohibition Of Unreasonable Searches And Seizures.

As discussed earlier, the initial seizure and boarding of the Chinook were lawful because consented to by defendants. As to the second boarding, Defendants maintain that the evidence found must be suppressed because the search was performed without reasonable suspicion or probable cause that a crime was being committed.

■ The preliminary issue that the Motion to Suppress raises is whether the constitutional guarantees of the fourth Amendment apply when United States enforcement officers act against United States citizens on another nation's sovereign territory (in this case another nation's sovereign flag ship on the high seas). The answer is yes. *United States v. Toscanino,* 500 F.2d 267, 280 (2nd Cir.1974) (going further than today's holding in applying the constitutional guarantees to aliens as well); *Best v. United States,* 184 F.2d 131, 138 (1st Cir.1950); *see also Jean v. Nelson,* 727 F.2d 957, 973 (11th Cir.1984); *Cardenas v. Smith,* 733 F.2d 909, 915 (D.C.Cir. 1984); *United States v. Demanett,* 629 F.2d 862, 866 (3rd Cir.1980); *Transportes Aeros Mercantiles v. Boyatt,* 562 F.Supp. 707, 709–10 (S.D.Fla.1983).

The next issue involves the level of suspicion required before Coast Guard officers acting on the high seas may perform a full search of a vessel. Because of the inherent problems involved in policing activity at sea, the power of the Coast Guard has historically been construed broadly. *See United States v. Williams,* 617 F.2d 1063 (5th Cir.1980) (en banc). Thus, the Coast Guard may stop and board an American vessel on the high seas, for purposes of a documentation and safety check, based on no suspicion at all. 14 U.S.C. Sec. 89(a); *United States v. Thompson,* 710 F.2d 1500, 1504 (11th Cir.1983). The Coast Guard may stop and board a foreign vessel on the high seas upon reasonable suspicion of criminal activity in violation of United States law. *United States v. Glen-Archila,* 677 F.2d 809, 813 (11th Cir.1982); *United States v. Williams,* 617 F.2d 1063, 1076 (5th Cir.1980) (en banc).

■ Once properly aboard, Coast Guard officers are given considerable opportunity to detect illegal activity pursuant to their document and safety inspection authority. As the Court stated in *United States v. Garcia,* 598 F.Supp. 533 (S.D.Fla.1984):

[The officers] may visit public areas of the boat and observe anything in plain view. They may enter the hold to check the main-beam identification number, and again may observe anything in plain view. *United States v. Odom,* 526 F.2d 339 (5th Cir.1976). If the door to the main hold is locked, they may properly break it open. *United States v. Thompson,* 710 F.2d 1500 (11th Cir.1983). Further, if a cabin is used for multiple purposes, the fact that one of its uses is private, i.e., it serves as living quarters, does not shield it from the legitimate scope of a safety inspection. *Id.* at 1506–7.

*Id.*

■ There is, however, a limit to the scope of the permissible investigation. As implied in the discussion above, anything in plain view during a legal document and safety inspection is deemed not to be subject to a legitimate expectation of privacy. *United States v. Williams,* 617 F.2d 1063, 1086 (5th Cir.1980). Conversely, anything not in plain view (or smell, as the case often is when marijuana is involved) from a legal vantage point during a permissible

document and safety inspection does have a legitimate expectation of privacy attached to it. In order to perform a full search, as was performed in this case when the officers pulled up carpet and molding to access interior portions of the vessel, the officers' suspicions must first have risen to the level of probable cause. *United States v. Andreu,* 715 F.2d 1497, 1500 (11th Cir.1983); *United States v. Herrera,* 711 F.2d 1546, 1556 (11th Cir.1983); *United States v. Gollwitzer,* 697 F.2d 1357, 1362 (11th Cir. 1983); *United States v. Gray,* 659 F.2d 1296, 1299 (5th Cir.1981); *United States v. D'Antignac,* 628 F.2d 428, 434 (5th Cir. 1980); *United States v. Kleinschmidt,* 596 F.2d 133, 136 (5th Cir.1979); *United States v. Whitmire,* 595 F.2d 1303, 1308 (5th Cir. 1979); *United States v. Garcia,* 598 F.Supp. 533 (S.D.Fla.1984).

In this case the officers did have probable cause to search. A strong suspicion was raised during the initial boarding by the unaccounted for space and structural modifications; by the radar fuzzbuster which is unusual for a pleasure craft; by a removable name plate on the stern; and by a positive EPIC check indicating that both the vessel and the defendants were suspected of narcotics trafficking. When all these factors are added to Lieutenant Bergeron's testimony that he saw one of the defendants throw a bag of white powder over the side during the initial boarding, the Court concludes that probable cause, justifying a full search, existed. Accordingly, the search did not violate the Fourth Amendment and the Motion to Suppress must be denied.