**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Reinaldo ANDREU, Defendant-Appellant.**

**No. 82–5418.**

United States Court of Appeals, Eleventh Circuit.

Sept. 26, 1983.

---

Greene & Cooper, P.A., Sharon L. Wolfe, Miami, Fla., for defendant-appellant.

Stanley Marcus, U.S. Atty., Neal B. Shniderman, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, and ANDERSON, Circuit Judge, and GOLDBERG *, Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Reinaldo Carlos Andreu, seeks review of his conviction for possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). We affirm.

## I. FACTS

Shortly before 11:00 a.m. on November 21, 1981, Customs Patrol Officer (CPO) Richard Ogden observed a yellow fishing vessel approaching the Crandon Park Marina on Key Biscayne, Florida. The vessel first attracted Ogden's attention because almost all other vessels were leaving rather than entering the marina at that time of day. Observing the vessel through binoculars, Ogden noticed that the vessel's windshield was covered with heavy salt spray, even though the sea was relatively calm. Ogden also noticed that the vessel appeared to be riding low in the water and pushing an unusually large wake. In addition, the vessel's steering console appeared to be high in relation to the remainder of the vessel, a fact which indicated to Ogden, based on his experience, that a space for hauling contraband might have been constructed between the deck and the bottom of the hull.

When the vessel reached the marina's public boat ramp, one of the two men on board got off, walked over to a car with a trailer, and backed the trailer up to the vessel. After the two men pulled the vessel onto the trailer, they drove the trailer a short distance from the ramp, parked, got out of the car, and stood beside the trailer talking. At that point, CPO Ogden drove over and parked his car alongside the trailer.[1] Ogden identified himself, and in response to several questions, Andreu indicated that he owned the vessel, the car, and the trailer. When Ogden asked to see Andreu's identification and the vessel's registration papers, Andreu patted his back pocket and then said the papers were in the vessel. Andreu then climbed aboard the vessel to get the papers, and Ogden stepped

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. Ogden testified that he purposely did not park his car in front of appellant's car and trailer in a manner which would have blocked appellant's exit from the marina area.

onto the fender of the trailer to watch him.[2] While in this position, Ogden confirmed his earlier observation that the deck appeared to be unusually high. He also noticed that the vessel appeared to have an unusual lack of storage space, that the vessel's deck was covered with teakwood, which he thought was unusual for an open fishing vessel, and that the deck was soaking wet, suggesting that it might have been washed down recently. In addition, when Andreu opened his duffel bag to obtain his identification and the vessel's registration papers, Ogden observed clothing and toiletries which seemed unnecessary for an ordinary fishing trip in Biscayne Bay.

Based on his observations, CPO Ogden decided to take a closer look at the vessel. Before doing so, he went back to his car to run a computer check on the papers Andreu had produced[3] and to radio for assistance. Then Ogden asked Andreu several routine questions, and Andreu indicated that he and his companion had merely been out on a fishing trip since 5:00 p.m. the previous day.

Approximately eight to ten minutes after Ogden first approached Andreu, Customs Patrol Officers Burge and Doherty arrived. Ogden introduced the two officers and then told Andreu that he would like to take a further look at the vessel. Andreu said "Fine" or "O.K." Ogden then told Andreu and his companion to sit down on a nearby pier while the officers inspected the vessel.

Once aboard the vessel, officers Ogden and Doherty conducted a thorough search. As Ogden was looking under the steering console, he noticed a small hole with wires protruding from it which was stuffed with paper. Ogden pulled out the paper, put his nose near the hole, and smelled marijuana. CPO Doherty also detected the smell of marijuana when he pulled the plug from a

drain hole in the stern of the vessel. In addition, the officers found several marijuana seeds scattered around the deck.

After making these discoveries, the officers decided to look under the deck. Although similar vessels generally have hatches that allow easy access to the area under the deck, Andreu's vessel did not. The officers attempted to remove the steering console, but were unable to do so.[4] The officers then attempted to poke a hole in the deck using a screwdriver and a hammer, but had no success. Finally, the officers obtained an electric saw from the downtown Customs office, towed the vessel to an electric outlet at a nearby guard station, and sawed a one foot square hole in the deck under the console. Below the deck they found approximately 500 pounds of marijuana.

Andreu moved to suppress the marijuana on a number of grounds. After an evidentiary hearing, the district court denied the motion. Andreu then stipulated to a non-jury trial based on the evidence introduced at the suppression hearing. The district court found Andreu guilty and sentenced him to a two-year term of imprisonment followed by a two-year special parole term.

## II. DISCUSSION

■ Andreu's first contention on appeal is that the Customs patrol officers had no authority to conduct their initial search of Andreu's vessel because they did not have reasonable suspicion of criminal activity. We disagree.

Before he even approached Andreu, CPO Ogden had observed that Andreu's vessel was coming into the marina at an unusual time, that the vessel appeared to be riding low in the water and pushing a large wake,[5]

---

2. CPO Ogden testified that he stepped up onto the fender to make sure Andreu didn't grab a weapon.

3. The computer check did not reveal anything suspicious.

4. The officers took off the molding around the console and removed all the screws which ap-

parently were holding the console in place, but the console still could not be removed.

5. Appellant's expert witness testified that the vessel probably was not riding low in the water, even though it was carrying a 500-pound load of marijuana, because the heavy inboard/outboard engine supplied by the manufacturer had been replaced by a lighter outboard engine, thus reducing the vessel's weight

that heavy salt spray covered the vessel's windshield,[6] and that the vessel appeared to have an unusually high console which, based on prior experience,[7] suggested to Ogden that the vessel might have been altered to carry contraband.[8] Subsequently, after Ogden drove alongside Andreu's parked trailer and asked Andreu for identification, Ogden noticed that the vessel appeared to have a lack of storage space,[9] that the deck was covered with teakwood, which Ogden thought was unusual,[10] that the deck was soaking wet, suggesting that it might have been washed down recently, and that Ogden had clothing and toiletries aboard which appeared to be unnecessary for an ordinary fishing trip. Although any one of these factors, considered separately, might not be sufficient to create a reasonable suspicion of criminal activity, we agree with the district court that, in combination, these factors gave CPO Ogden a reasonable suspicion that Andreu's vessel was carrying contraband. Accordingly, we reject Andreu's contention that the initial search was illegal because it was not based on reasonable suspicion.[11]

 Andreu's other argument on appeal relates to the scope and manner of the search of his vessel. According to Andreu, the Customs patrol officers "spent three hours taking apart [the] vessel, poking holes, tearing up the console, and finally cutting a large hole in the deck." Brief of Appellant at 49. Andreu argues that there were no exigent circumstances which prevented the officers from obtaining a warrant before conducting the search and that such a high level of governmental intrusion should not be permitted without authorization from a neutral magistrate.

Appellant's argument is without merit. The Customs patrol officers clearly had probable cause to search the vessel once they smelled marijuana and found marijuana seeds on the deck. *See, e.g., United States v. Gollwitzer,* 697 F.2d 1357, 1362 (11th Cir.1983). "Once the agents had probable cause to search the vessel, that probable cause supported a search of every part of the vessel that might contain the object

---

significantly. The district judge did not give much credence to the expert's testimony because the expert "admitted that he had never tested his hypothesis and that he had never actually seen a boat under similar conditions." Record on Appeal, vol. 1, at 73 (written findings of the district judge). Moreover, the record reveals that alterations in the vessel's structure and/or the positioning of the load of marijuana may have made the vessel *appear* to ride low in the water even though the total weight was not significantly greater than on similar vessels.

6. *See, e.g., United States v. Whitmire,* 595 F.2d 1303, 1306 (5th Cir.1979) (fact that "officers saw that the boat was encrusted with salt crystals such as might have formed during an extended ocean voyage" contributed to reasonable suspicion), *cert. denied,* 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980).

7. CPO Ogden testified that he boarded an average of 25 to 30 vessels per week while performing his Customs duties. Record on Appeal, vol. 2, at 12.

8. Appellant's expert witness testified that the deck of the vessel was not unusually high. The district court noted, however, that the expert "did not deny that the deck had been altered." Record on Appeal, vol. 1, at 73.

9. Appellant argues that the vessel had a number of storage hatches which Ogden overlooked, but admits that modifications to the vessel resulted in the closing and covering of several of the original hatches.

10. Appellant's expert testified that the vessel came with teakwood trim, but admitted that this particular vessel had additional teakwood which had not been installed at the factory. Thus, although some teakwood normally might be found on similar vessels, Ogden correctly recognized that the amount of teakwood on Andreu's vessel was unusual.

11. Our conclusion that the initial search was based on a reasonable suspicion of criminal activity makes it unnecessary to consider the government's alternative argument that Andreu consented to the search of his vessel. We also need not consider whether the Supreme Court's decision in *United States v. Villamonte-Marquez,* —— U.S. ——, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), holding that Customs officers can board for inspection of documents any vessel located in waters providing ready access to the sea without any suspicion of wrongdoing, should be applied retroactively and, if so, whether it would apply to the particular facts of this case.

of the search...." *Id.*[12] Further, our review of the record indicates that the officers conducted their search in a reasonable manner, cutting a small hole in the deck of the vessel only after less destructive methods of examining the interior proved to be unsuccessful.[13]

The judgment of the district court is AFFIRMED.

---

12. Appellant contends that different rules should be applied because the boat had already been removed from the water and placed on a trailer. We decline to address this argument because the result would be the same even if we applied the rules applicable to vehicle searches. *See United States v. Ross,* 456 U.S. 798, 825, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982) (holding that when officers have probable cause to search a lawfully stopped vehicle, they can search "every part of the vehicle and its contents that may conceal the object of the search").

13. Obviously, law enforcement officers must be careful to avoid damaging personal property when conducting a search. *See, e.g.,* 2 W. LaFave, Search and Seizure, § 4.10, at 161 (noting the "longstanding" rule that officers executing a search warrant must "avoid unnecessary damage to the premises"). When law enforcement officers have a right to conduct a full-scale search of a vessel, however, they can take reasonable measures which are necessary to gain access to any areas of the vessel that might contain the object of their search. *Cf. Dalia v. United States,* 441 U.S. 238, 258, 99 S.Ct. 1682, 1694, 60 L.Ed.2d 177 (1979) (noting that "officers executing search warrants on occasion must damage property in order to perform their duty"). Otherwise, a person could preclude inspection of a vessel's interior simply by covering over all entrances to the interior so that some damage to the vessel would be inevitable if officers attempted to conduct a full-scale search.