Johnson, Circuit Judge, concurred specially and filed opinion.

**UNITED STATES of America,
Plaintiff-Appellant,**

**v.**

**Ramon Antonio LOPEZ and Carlos
Abraham Gomez,
Defendants-Appellees.**

**No. 84–5362.**

United States Court of Appeals,
Eleventh Circuit.

May 28, 1985.

Stanley Marcus, U.S. Atty., Linda Collins-Hertz and David O. Leiwant, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellant.

Mark King Leban, Miami, Fla., for defendants-appellees.

Before FAY and JOHNSON, Circuit Judges, and DYER, Senior Circuit Judge.

PER CURIAM:

## I. STATEMENT OF THE CASE

### A. The Facts

On May 3, 1983, a Coast Guard vessel sighted the C & E, the ship on which appel-

lees were travelling, heading toward the Florida Coast. Approaching the C & E to make a document and safety search, Coast Guard Officer Garza noticed that the vessel was riding low in the water, as if it were carrying heavy cargo. When he boarded the C & E, Garza discovered there were only two persons aboard: Lopez, the master, who spoke no English; and Gomez, the crew, who had some facility with the language and served as interpreter. Garza requested the registration of the vessel, which was provided, and personal identification from appellees. Lopez provided an expired Florida driver's license. Gomez identified himself as Carlos Gonzales, but was unable to spell the surname when asked. Appellees stated that they were resident aliens, but neither was able to produce a green card. The vessel registration showed that the ship was owned by Antonio Perez, who was not aboard. Lopez stated that Perez was a friend who had given him verbal permission to use the boat, but he was unable to provide a phone number for Perez. While he was conducting a safety-type sweep of the vessel, Garza noticed approximately three feet of unaccounted-for space between the ice hold and the engine room. Though there were ventilation pipes leading from this space, there was no visible access to it, and Garza suspected it contained a hidden compartment. When he tapped on the wall of the space, Garza heard a solid, "dead thud," as if something might be in there.

Garza notified his commanding officer that he had strong suspicions that the C & E contained a hidden compartment, that the owner was not on board and that the master and crew were resident aliens without green cards. Garza was instructed to ask Lopez whether he would follow the Coast Guard vessel to the Islamorada Coast Guard base and whether they would permit two members of the boarding party to remain on board during the three-hour trip. Lopez agreed and took the C & E to Islamorada. At Islamorada, the vessel was examined by Customs Patrol Officer Arnold, a veteran of over 200 searches for secret compartments. Garza told him that the configuration of the vessel resembled that of a previously-seized vessel containing a secret compartment which Garza had viewed during a training seminar. Arnold observed that the ship had a raised deck with a larger-than-normal fuel tank and a false water line, painted to make the vessel look as though it was riding higher in the water than it actually was. Examining the interior of the main cabin, Arnold noticed fresh fiberglass work under the stove above the three feet of unaccounted-for space earlier noted by Garza. He then removed the stove and used an axe to crack the fiberglass. He found a wooden panel underneath and lifted it to reveal bales of marijuana.

Garza then read Gomez his constitutional rights in English and Arnold gave Lopez his rights in Spanish; each signed waiver forms. Lopez stated that on their return from Orange Cay, to take some diesel fuel to a generator, they had seen the bales of marijuana floating in the water. They had placed them in the hidden compartment, fiberglassed over the board and painted it. Gomez signed a written statement prepared by Arnold.

## B. Course of Proceedings

A federal grand jury in the Southern District of Florida returned an indictment charging appellees with conspiring to possess marijuana with the intent to distribute it, in violation of 21 U.S.C.A. §§ 955a(a) and 955c (Count I), and possessing marijuana with intent to distribute it, in violation of 21 U.S.C.A. § 955a(a) and 18 U.S.C.A. § 2 (Count II).

Appellees filed a motion to suppress the evidence seized in the search of the C & E, and statements they had made following their formal arrests. The court held an evidentiary hearing on the motion to suppress and subsequently granted it. From this decision the government appeals.

## II. THE SUPPRESSION ORDER

### A. Fourth Amendment Standing

 As the Supreme Court has recently noted, "the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise 'illegitimate'." *New Jersey v. T.L.O.,* — U.S. —, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985). "To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is 'prepared to recognize as legitimate.'" *Id.* (quoting *Hudson v. Palmer,* — U.S. —, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)). The requirement for a justifiable expectation of privacy is two-fold. The defendant must show an actual or subjective expectation of privacy in the area searched and the expectation must be one that "society is prepared to recognize as 'reasonable.'" *Hudson v. Palmer,* 104 S.Ct. at 3199 (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

In *New Jersey v. T.L.O.,* 105 S.Ct. 733, the Supreme Court found that a student had a reasonable expectation of privacy in her purse, despite the state's argument that the need for maintenance of discipline overrode any expectation of privacy by the student. The Court contrasted this situation with that of the need to maintain order in a prison such that prisoners may not retain a legitimate expectation of privacy in their prison cells. *Id.* at 742. *See Hudson v. Palmer, supra.* The Court thus balanced the defendant's claim of privacy in light of "the government's need for effective methods to deal with breaches of public order." *New Jersey v. T.L.O.,* 105 S.Ct. at 741. Our courts have frequently recognized the need for effective methods to deal with the critical and pervasive problem of the importation of drugs. *See United States v. Williams,* 617 F.2d 1063, 1087 (5th Cir.1980) (en banc). This case is more analogous to the situation the Court faced in *Hudson v. Palmer* (the prison cell search) than that faced in *New Jersey v.*

*T.L.O.* (the student purse search) in terms of the needs of the government in preventing breaches of the public order as balanced against the defendant's subjective expectations of privacy.

 Moreover, the standards which define privacy interests at sea may be more restrictive than those applicable on land: "'the heavy overlay of maritime law and the long practice of regulatory stops, inspections and searches' by Customs officers further diminish the privacy interests of sailors." *United States v. Herrera,* 711 F.2d 1546, 1553 (11th Cir.1983). It is not sufficient, for example, that a sailor have the right to exclude others from a ship in order to have a legitimate expectation of privacy, because a Coast Guard officer may board without permission to conduct a safety and document search and gain access to all common areas of a boat. *United States v. Herrera, supra,* 711 F.2d at 553 and n. 12. Courts have therefore held that "neither captain nor crew has a legitimate expectation of privacy ... in an area which is subject to the common access of those legitimately aboard the vessel." *United States v. Freeman,* 660 F.2d 1030, 1034 (5th Cir. Unit B 1981). Such common areas have been held to include cargo holds, *United States v. Williams,* 617 F.2d 1063 (5th Cir.1980); ice holds, *United States v. DeWeese,* 632 F.2d 1267 (5th Cir.1980); and engine rooms, *United States v. Stuart-Caballero,* 686 F.2d 890 (11th Cir.1982), *cert. denied,* 459 U.S. 1209, 103 S.Ct. 1202, 75 L.Ed.2d 444 (1983). This does not mean, however, that a sailor lacks an expectation of privacy in any area of a ship; living and sleeping quarters of the crew, *United States v. Whitmire,* 595 F.2d 1303, 1312 (5th Cir.1979), and private spaces such as dufflebags and footlockers, *United States v. DeWeese, supra,* 632 F.2d at 1271, have been held to be sufficiently private as to confer Fourth Amendment standing upon those with dominion over them when they are subjected to search.

 However, the instant case does not involve the search of such private spaces as

the sailors' sleeping quarters or personal belongings; rather, this was a search of a secret compartment beneath the deck of the boat. Obviously, appellants had an actual, subjective expectation of privacy in the area searched: they did not want the drugs found. We are not, however, prepared to say that such an expectation is "one that society is prepared to recognize as 'reasonable'." *Hudson v. Palmer*, 104 S.Ct. at 3199 (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). A secret compartment constructed within the confines of the hull of the ship is totally unlike a personal dufflebag or footlocker in terms of the uses to which it may be put, and the expectations of exclusive control to which it gives rise. We cannot imagine that society would recognize a reasonable expectation of privacy in the use of "dead space" in the hull of a ship, sealed with permanent fiberglass and painted to match the surrounding surfaces, for the legitimate storage of personal items. Appellants have not met the second requirement in asserting standing, which the Supreme Court has noted is of "controlling importance." *Hudson v. Palmer*, 104 S.Ct. at 3199 n. 7. They therefore have no standing to challenge the Coast Guard's search in this case.

### B. The Validity of the Search

Even if the foregoing analysis were incorrect, and appellants had standing to raise a Fourth Amendment claim, the search which was conducted by the Coast Guard Officers was consistent with constitutional standards.

Coast Guard officers are authorized, pursuant to 14 U.S.C.A. § 89(a),[1] to make safety and document inspections without suspicion of criminal activity. *United States v. Williams, supra; United States v. Odom*, 526 F.2d 339 (5th Cir. 1976). A limited search, as described above, is permissible on a reasonable suspicion of criminal activity; and a full, "stem to stern" search may be undertaken on probable cause. *United States v. Boza*, 741 F.2d 1382 (11th Cir.1984); *United States v. Andreu*, 715 F.2d 1497 (11th Cir. 1983). The general standard to be employed in determining whether probable cause existed is whether there were facts and circumstances known to law enforcement officials which could have warranted their reasonable belief that a crime had been or was being committed, *United States v. Long*, 674 F.2d 848 (11th Cir. 1982), or whether viewing such facts in their totality, together with the synthesis of what the agents collectively heard, knew and observed, all considered in light of the agent's individual experience, there was the probability that criminal activity was afoot. *United States v. Agostino*, 608 F.2d 1035 (5th Cir.1979).

The district court suppressed the evidence on the ground that the entire vessel

---

**1.** 14 U.S.C.A. § 89(a) provides: "The Coast Guard may make inquiries, examinations, inspections, searches, seizures and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized."

was, in effect, seized when it was boarded and taken to Islamorada, and such seizure was unconstitutional because the Coast Guard had only reasonable suspicion and not probable cause at the time that it occurred. The district court also found that, even if there was probable cause at the time the C & E was taken into custody, the search would still have been unconstitutional because the method used—taking the vessel 40 miles away for further investigation three to four hours later—was unreasonable. Appellees agree, arguing that none of the factors cited by the Coast Guard, or any combination of them taken together, provide probable cause for an arrest at sea; and, while the additional factors discovered at Islamorada by officer Arnold might have given rise to probable cause, it was too late because the seizure of the vessel had already occurred.

The government argues that the totality of the circumstances observed by the officers on their initial boarding gave them reason to believe that criminal activity was afoot and established probable cause for a full search of the vessel. Once that probable cause was established, the Coast Guard had the right to take the vessel to its station at Islamorada for a more extensive search.[2]

▮ According to the standards applied in comparable cases, the Coast Guard officers had probable cause by the time they finished the initial search of the vessel and decided to take it to Islamorada. On sighting the vessel, they noticed that it was riding low, as if carrying a heavy cargo. On boarding, they noticed several suspicious things about the crew of the vessel: they claimed they were resident aliens, but could present no green cards, and had only

one expired driver's license between the two of them as proof of identification; Gomez gave a false name, which he was unable to spell; Lopez stated that he had been given permission to take the boat by its owner, but was unable to provide the telephone number of that individual. Officer Garza also noticed certain structural peculiarities of the boat which led him to believe there was a secret compartment: he saw a three-foot region of unaccounted-for space, which had ventilation but no visible route of access; when tapped, this area gave a dull thud as if full; the boat had the same physical "configuration" as a vessel Garza had observed at a Coast Guard training seminar, which had a secret compartment. In light of Officer Garza's experience, these factors were sufficient to give rise to a belief that there was criminal activity afoot.

The factors identified by the officers on boarding are, moreover, similar to those found to provide probable cause for a search in *United States v. Boza, supra.* In *Boza,* the officers observed a vessel riding low and emitting exhaust as if carrying heavy cargo; on boarding they found it was not equipped for fishing; and they found structural modifications (extra fuel tanks, modifications in the cabin of a type used to create secret compartments) suggesting that secret storage compartments were present. They took the boat to Islamorada where they subsequently found marijuana residue and a raised deck; but the court found that they had probable cause at the time they left for Islamorada. *Id.* at 2–3. The circumstances giving rise to probable cause are also similar to those in *United States v. Andreu, supra.*[3] In *Andreu,* Customs officers observed a vessel riding low, with a high console and salt

---

**2.** The government also claimed that it had probable cause to arrest the appellees at sea, as they were aliens travelling without green cards. But because probable cause can be established in connection with the suspected drug violations, we need not address this arguably more pretextual claim.

**3.** The court in *Andreu* did not specifically address the question of whether these circumstances gave rise to probable cause, because appellant's challenges were that officers lacked reasonable suspicion and applied unreasonable methods in the opening of the deck, but the decision to uphold the search itself is indicative of the court's conclusion that probable cause was present.

spray on the windshield. A closer look prior to boarding (the ship was docked), revealed a lack of storage space, a peculiar teakwood covering, a wet deck and crew toiletries unnecessary for a fishing trip. Although the indicia of structural modification in *Andreu* were less strong than those present in the instant case, the court upheld the search.

 Once the officers had probable cause to search the vessel, it was not unreasonable to take it to Islamorada for the subsequent investigation. Even putting aside the consent of crew members (which was obtained, although crew members claimed to have perceived no choice), the taking of a vessel to the Coast Guard station at Islamorada once probable cause was established was approved in *United States v. Boza, supra.* And the search conducted once the vessel arrived at Islamorada was in no respect unreasonable: further structural alterations, such as a false waterline and fiberglass work, were observed by Agent Arnold, who then used an axe to gain access to the secret compartment. Reviewing these facts gives rise to a "definite and firm impression" that the district court erred in granting the motion to suppress.[5]

The judgment of the district court granting appellees' motion to suppress is REVERSED.

JOHNSON, Circuit Judge, concurring specially:

Although I concur in the result reached by the majority in this case, I cannot agree that appellees lacked standing. The doctrine of Fourth Amendment standing, as developed on land and at sea, clearly demonstrates that appellees had standing to challenge the search in this case.

The courts have rejected the notion that every defendant enjoys "automatic" standing to challenge the legality of a search or seizure, or that Fourth Amendment rights may be "vicariously" asserted by defendants who are not themselves the victims of an invasion of privacy. *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). A defendant who challenges a search and seizure on Fourth Amendment grounds must establish that he had an expectation of privacy in the area searched and the items seized. This expectation must be based either upon concepts of real or personal property law or upon understandings which are recognized and permitted by society. *Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

A defendant, as noted above, need not establish a property interest in order to

---

5. The government also argues that the evidence should be admissible under the independent source and good faith exceptions to the warrant requirement. Neither of these claims has merit. Regardless of its conformity to constitutional requirements, the search that took place once the C & E arrived at Islamorada could not be regarded as an independent source of evidence. If the seizure at sea were to be held invalid, the subsequent search at the Coast Guard base would be tainted and therefore ineligible as an independent source. *Compare with Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (information came from "sources wholly unconnected with the [disputed] entry and was known to the agents well before the initial entry"). If the seizure at sea were held to be valid, the independent source

doctrine would not be necessary to validate the seizure of the marijuana at Islamorada.

The good faith exception is not currently broad enough to cover the circumstances of this search. The rule announced in *United States v. Leon*, —— U.S. ——, 104 S.Ct. 3430, 82 L.Ed.2d 702 (1984), applies to "officers acting in reasonable reliance on a warrant issued by a detached and neutral magistrate but ultimately found to be invalid." That version of the rule relied upon by the former Fifth Circuit in *United States v. Williams*, 622 F.2d 830 (5th Cir.1980), also applies to the reliance of officers on a statute which is later held unconstitutional or a court precedent which is later overruled. It has not yet been considered, or determined, whether this exception applies to Coast Guard searches at sea.

lawful possession or control with the right to exclude, *United States v. Glasgow,* 658 F.2d 1036, 1044 (5th Cir. Unit B 1981); the legitimacy of one's presence on the premises, a subjective expectation of freedom from governmental intrusion, the taking of normal precautions to maintain privacy, *United States v. Haydel,* 649 F.2d 1152, 1155 (5th Cir. Unit A 1981); or an expectation of privacy related to the nature of the place in which the item was secreted, *United States v. Brown,* 731 F.2d 1491, 1495–96 (11th Cir.1984). It is not sufficient to demonstrate an ownership or possessory interest in the contraband discovered. *Rawlings v. Kentucky,* 448 U.S. 98, 105–06, 100 S.Ct. 2556, 2561–62, 65 L.Ed.2d 633 (1980).

As the opinion for the Court points out, captain and crew do not have a legitimate expectation of privacy in areas subject to the common access of those legitimately aboard the vessel but they do have a legitimate expectation of privacy in areas such as living and sleeping quarters, dufflebags, and footlockers.

The district court did not discuss the issue, but appears to have assumed that appellees had standing to challenge the search; on appeal the government argues that no legitimate expectation of privacy existed. The government contends that though Lopez was the captain of the vessel, he had no legitimate right of occupation or control, as he could not even provide the phone number of the man who allegedly lent him the boat. The government also claims that Lopez and Gomez had no reasonable expectation of privacy arising from the nature of the location, and no legitimate interest, which would give rise to an expectation of privacy, in the contraband.

Appellees argue that, despite their lack of personal familiarity with the owner, they had his permission to take the boat, which conferred both a right of possession and a right to exclude others during the time that they were on board. They argue that their interest is distinguishable from those rejected in *Freeman, Williams* and *DeWeese,* as the secret compartment in which their contraband was stored was not an area to which all those on board would normally have access. They argue further that the presence of those factors relied upon to confer standing in *Haydel*—right to exclude others, subjective expectation of freedom from governmental intrusion, taking of normal precautions to maintain privacy, legitimacy of presence on premises—suggests that they had a legitimate expectation of privacy in the compartment searched.

On the basis of the precedent described above, appellees have a legitimate expectation of privacy in the area searched. Appellees' claim of permission from the owner was not refuted by the government; although the government demonstrates that appellees had no personal relationship with the owner, this by no means disproves their allegations that he lent them the boat, thus conferring the possessory interest and the right to exclude held determinative in *Glasgow.* Moreover, appellees correctly note that the *Haydel* factors militate in favor of their standing. Not only their legitimate presence and right to exclude, but their subjective expectation that a secret compartment beneath the deck of a boat would be free from governmental intrusion and the painting and construction efforts associated with protecting their privacy suggest that a legitimate expectation existed. Although such land-based standards are not always sufficient to identify privacy interests at sea, the area at issue does not fall into any of the categories in which additional restrictions have been recognized. A secret compartment is not an area which the Coast Guard is statutorily authorized to search on a safety and document inspection, *United States v. Herrera, supra.* It is not an area to which all those aboard characteristically enjoy access, *United States v. Freeman, supra.* Indeed it is similar to a dufflebag or footlocker in terms of the uses to which it may

be put, and the expectations of exclusive control to which it gives rise.[1] In light of these factors, I would hold that appellees have standing to challenge the validity of the search and seizure.

---

**1.** I must also take issue with the majority's conclusion that the privacy interests of appellees in this case bear closer resemblance to those of the prisoners in *Hudson v. Palmer,* — U.S. —, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) than to those of the high school students in *New Jersey v. T.L.O.,* — U.S. —, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). As the Court observed in *T.L.O.,* the diminished privacy interest of the prisoners in their personal belongings was attributable primarily to "the harsh facts of criminal conviction and incarceration," 105 S.Ct. at 742 (*quoting Ingraham v. Wright,* 430 U.S. 651, 669, 97 S.Ct. 1401, 1411, 51 L.Ed.2d 711 (1977) ). As individuals who had been neither convicted of nor sentenced for the commission of any crime, appellees enjoyed an expectation of privacy in the private compartments of the boat which society should have been willing to recognize as legitimate.