UNITED STATES of America, Plaintiff,

v.

Yerco Huerta ROJAS, et al., Defendants.

No. 92–0044–CR.

United States District Court, S.D. Florida.

June 13, 1992.

Phillip DiRosa, Aloyma Sanchez, Asst. U.S. Attys., Miami, Fla., for plaintiff.

Jose Quinon, Miami, Fla., for Yerco Huerta Rojas.

Stuart Adelstein, Miami, Fla., for Luis Lorenzo Berrios.

Louis Casuso, Miami, Fla., for Eduardo Gomez Verdugo.

Joel DeFabio, Coral Gables, Fla., for Gabriel Munoz Silva.

Leonard P. Fenn, Coral Gables, Fla., for Carlos Arturo Carreno.

Julio Jimenez, Coral Gables, Fla., for John Castillo Tramon.

David Rothman, Miami, Fla., for Luis Farias-Concha.

Stephen T. Maher, Miami, Fla., for Manuel Flores-Flores.

Thomas F. Almon, Miami, Fla., for Carlos Humberto Campos-Canate.

Michael J. Rosen, Miami, Fla., for Claudio Perez.

Jay White, Miami, Fla., for Emilio Henriquez.

Mark H. Hildebrandt, Miami Beach, Fla., for Mauricio Villanueva Bonilla.

Bruce D. Raticoff, Ft. Lauderdale, Fla., for Hector Herman Vidal Arancibia.

Samuel J. Rabin, Jr., Miami, Fla., for Fernando Barria.

David Raben, Miami, Fla., for Fernando Gonzalez-Lopez.

Jay R. Moskowitz, Coconut Grove, Fla., for Domingo Quezàda.

Nathan P. Diamond, Miami, Fla., for Manuel Perez-Vera.

Rick Freedman, Miami, Fla., for Luis Aravena.

Paul Lazarus, Miami, Fla., for Leandro Mondaca.

Roy Kahn, Miami, Fla., for Carlos Zuluaga.

Reemberto Diaz, Hialeah, Fla., for Edwardo Marco Diaz.

Harry M. Solomon, Miami, Fla., for Osvaldo Sotqui.

Patricia J. Kyle, Miami, Fla., for Ernesto Vidal-Vera.

A.J. Goodman, Miami, Fla., for Enrique Alvarada.

Richard A. Moore, Miami, Fla., for Guillermo Quesada.

Jay L. Levine, Miami, Fla., for Luis Guerra.

Joel Kaplan, Miami, Fla., for Juan Antonio Orlandi-Steiger.

Richard C. Hutchison, Miami, Fla., for Guillermo Guerrero.

## OMNIBUS ORDER

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon the motions listed below, which, pursuant to its previous order, the Court deems adopted by all defendants:

1.  Defendant Yerco Huerta Rojas' Motion to Dismiss Indictment and to Suppress Evidence, filed May 15, 1992.

2.  Defendant Osvaldo Sotgiu-Quijada's Motion to Suppress Evidence, Incorporated Memorandum of Law and Request for Evidentiary Hearing, filed May 14, 1992;

3.  Defendant Yerco Huerta Rojas' Consolidated Motion to Suppress Seizure of Personal Effects and to Adopt Similar Motions filed by his Co-Defendants, filed May 15, 1992;

4.  Defendant Carlos A. Carreno's Motion to Suppress Evidence Re.: Items Seized from Cabin, filed May 15, 1992;

5.  Defendant Luis Lorenzo Berrios' Motion to Suppress Physical Evidence, filed May 14, 1992;

6. Defendant Claudio Perez Gomez's Motion to Suppress, filed May 14, 1992; and Supplement, filed June 2, 1992;

7. Defendant Gabriel Munoz–Silva's Amendment to Motion to Suppress Evidence, filed May 15, 1992; and

8. Defendant Leandro Mondaca's Motion to Suppress Evidence Re: Items Seized from Defendant Mondaca's Quarters and Motion to Adopt, filed May 27, 1992.

The Court held an evidentiary hearing on this matter on May 28 and 29, 1992. For the reasons more fully stated below, the Court denies the defendants' motions.

## BACKGROUND

The defendants in this case are the crew members of the Panamanian M/V "Harbour." The government's indictment is in three counts: conspiracy to possess with intent to distribute a controlled substance aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C.App. § 1903; possession of a controlled substance aboard a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C.App. § 1903; and attempt to import a controlled substance into the United States, in violation of 21 U.S.C. §§ 952(a), 963, and 960.

## FINDINGS OF FACT

In light of the evidence proffered at the hearing held by the Court to address the motions listed above, the Court makes the following findings of fact. The Court notes that its summary of the events that occurred in the Caribbean Sea is a synthesis of the ship's log from the Coast Guard Cutter "Campbell." (Evidentiary Hearing, Court's Exhibit A.) The Court adopts the contents of the log as the undisputed factual account of such events. The Court found credible and adopts as its factual findings the testimony presented at the evidentiary hearing by United States Coast Guard Lt. Richard Roncone. Moreover, the Court also found credible the testimony of Special Agent John Tobin. As to other factual findings, the Court cites to the supporting documentary evidence as appropriate.

*A. Events on Sunday, January 5, 1992 in the Caribbean Sea* (all times in military time):

1. At 20:56, the United States Coast Guard Cutter "Campbell" made radio contact with a vessel, which identified herself as the M/V "Harbour", a Panamanian vessel, near Latitude 19.01 North, Longitude 75.02 West.

2. At 21:09, the "Campbell" asked for permission to board the "Harbour". The master of the "Harbour" refused consensual boarding until he could receive permission from the owner of the vessel.

3. At 22:05, the "Campbell" requested a statement of no objection (SNO) to board the "Harbour" from Coast Guard District 7.

4. At 22:15, the "Campbell" observed that the "Harbour" had secured (put out) its lights, and that people on deck were putting a jacob's ladder over the side.

5. At 22:20, the master of the "Harbour" claimed he lost power.

6. At 22:25 on January 5, 1992, the "Campbell" asked the master of the "Harbour" if he was in need of help, and observed the lowering of a lifeboat from the "Harbour."

7. At 22:30, the master of the "Harbour" claimed he was taking on water in the engine room.

8. At 22:31, the "Campbell" observed a package being thrown over the side of the "Harbour".

9. At 22:36, the "Campbell" observed a life boat in the water on the port side of the "Harbour".

10. At 22:39, the "Campbell" observed two life crafts astern of the "Harbour", smoke coming from the "Harbour's" stacks, and "Harbour" personnel embarking on the life crafts.

11. At 22:40, the master of the "Harbour" stated that the engine room was flooding and that the vessel was in danger of sinking.

12. At 22:47, a boarding team left the "Campbell" en route to the "Harbour." The master of the "Harbour" stated that the ship was on fire; the "Campbell" observed smoke coming from the "Harbour's" stacks.

13. At 23:04, the master of the "Harbour" stated that all personnel were off the "Harbour," and that the "Campbell" had permission to go on board.

14. At 23:12, the rescue and assistance team left the "Campbell" en route to the "Harbour" with a life raft in tow.

15. At 23:18, the boarding team boarded the "Harbour."

16. At 23:39, the boarding officer reported three feet of water flooding the engine room.

17. At 23:46, the rescue and assistance team boarded the "Harbour."

18. At 23:51, the "Campbell" crew completed the transfer of all twenty eight members of the "Harbour" crew aboard the "Campbell."

B. *Events on Monday, January 6, 1992 in the Caribbean Sea* (all times in military time):

19. At 00:06, with the boarding team and the rescue and assistance team on board, the "Harbour" was taking on water in the engine room. The commanding officer of the "Campbell" ordered his teams to abandon ship.

20. At 09:55, the master of the "Harbour" gave the "Campbell" permission to go aboard the "Harbour."

21. At 10:37, the rescue and assistance team left the "Campbell" en route to the "Harbour."

22. At 10:44, Miami Operation informed the "Campbell" that the Coast Guard Commandant and District 7 had granted a statement of no objection (SNO) to board and search the "Harbour."

23. At 10:45, the rescue and assistance team boarded the "Harbour."

24. At 11:37, another team from the "Campbell," the sweep team, boarded the M/V "Harbour."

25. At 14:05, additional personnel joined the "Campbell" teams aboard the "Harbour."

26. At 15:27, the sweep team found a substance that tested positive for cocaine aboard "Harbour."

27. At 19:55, the "Campbell" received a statement of no objection (SNO) from Coast Guard District 7 and Commandant to seize the "Harbour" and arrest the crew.

28. At 20:23, the "Campbell" crew seized the "Harbour."

29. At 21:08, the "Campbell" crew placed the master and crew of the "Harbour" under arrest for violation of United States law.

C. *Information leading the "Campbell" to contact the "Harbour"*:

30. The "Campbell" received information to the effect that the "Harbour" may be transporting cocaine. (Testimony at Evidentiary Hearing.)

D. *Cause of flooding and fire aboard the M/V "Harbour;" and location and quantity of contraband found on the "Harbour"*:

31. The flooding of the "Harbour" was created by the removal of three sea strainers in the engine room and the opening of the sea chest valves. The chief engineer of the "Harbour" told a crew member on board the "Campbell" how to stop the flooding, and described where the sea chest valves were located. (Testimony of Lt. Roncone at Evidentiary Hearing.)

32. The fire appears to have been started by a flammable liquid being thrown into the turbo chargers on the "Harbour's" main engines. As further evidence of arson, the Coast Guard found a partially filled glass bottle of alcohol, with a gauze material stuffed at the top, in the electrician's stateroom. (Testimony of Lt. Roncone at Evidentiary Hearing.)

33. The "Campbell" team discovered approximately 9,921 pounds of cocaine in hold # 5 within a load of zinc concentrate, and approximately 500 pounds of cocaine float-

ing in the engine room. A later search uncovered two more kilograms of cocaine that had apparently come loose from the cocaine floating in the engine room, and one half pound of marijuana in the ship's hospital. (Testimony of Lt. Roncone at Evidentiary Hearing.)

34. The "Campbell" team found drag marks on the hold deck leading to hold # 5, which was filled with zinc powder. In the zinc powder, the team found more drag marks, several sets of footprints, and approximately 12 shovels. Inside the pile of zinc, the team found bales containing cocaine packages. (Affidavit of Michael B. Chase, Special Agent, Drug Enforcement Administration, Defendant's Motion to Dismiss Indictment, Exhibit A.)

### E. Events on Monday, January 6, 1992 in Panama:

1. The American Embassy in Panama telefaxed a letter to the Panamanian government (Luis Ramon Fabrega, Director General Consular Y De Naves—"Secnaves") containing the following requests:

a. verification of registry for the M/V "Harbour";

b. permission for the U.S. Coast Guard to board the "Harbour" and search; and

c. if contraband found, permission to take law enforcement action in accordance with U.S. law and, if not, in accordance with Panamanian law.

(Defendant's Motion to Dismiss Indictment, Exhibit C.)

2. The Panamanian government, through Luis Ramon Fabrega, Director General Consular Y De Naves—"Secnaves", telefaxed the following information to the American Embassy in Panama:

a. the M/V "Harbour" is a Panamanian registered vessel, owned by Clinton Maritime Corporation;

b. the Panamanian government authorized the United States Coast Guard to board the "Harbour" on behalf of the Republic of Panama; and

c. if contraband was found on board, the American Embassy was instructed to contact Secnaves for additional measures.

(Defendant's Motion to Dismiss Indictment, Exhibit D.)

### F. Events on Tuesday, January 7, 1992 in Panama:

3. The United States Embassy in Panama telefaxed a request to the Panamanian government (Luis Ramon Fabrega, Director General Consular Y De Naves—"Secnaves") asking Panama's permission to arrest the crew of the M/V "Harbour" and to seize the vessel under United States law.

(Defendant's Motion to Dismiss Indictment, Exhibit E.)

4. The Panamanian government, through Luis Ramon Fabrega, Director General Consular Y De Naves—"Secnaves", telefaxed the American Embassy informing it of the following:

"After receiving your verbal report on the condition of the vessel, the amount of contraband found on board, and imminent danger of sinking of the vessel, we are granting permission to take enforcement action in accordance with U.S. law."

(Defendant's Motion to Dismiss Indictment, Exhibit F.)

The Court finds that the letters exchanged by the American Embassy and Secnaves, dated January 6 and January 7, 1992, constitute formal confirmation of the verbal statements of no objection (SNO's) transmitted to the "Campbell" on January 6, 1992 at 10:44 and 19:55, respectively.

### G. Subsequent events:

1. The "Campbell" towed the "Harbour" to the United States naval base in Guantanamo, Cuba. From Guantanamo, the "Harbour" crew flew to Miami, Florida on January 9, 1992. The Coast Guard towed the "Harbour" to Port Everglades, Florida. In Port Everglades, government agents conducted further searches of the vessel and its cargo. (Testimony at Evidentiary Hearing and Undisputed Factual Assertions in the Parties' Motions and Responses.)

2. In the early morning hours of January 10, 1992, the defendants arrived at the

Metropolitan Correction Center ("MCC") in Miami. Upon arrival, personnel at MCC seized the clothing that each of the defendants wore and placed all items in safe-keeping. The defendants were issued institutional garb to wear during their stay at MCC. (Testimony at Evidentiary Hearing and Undisputed Factual Assertions in the Parties' Motions and Responses.)

3. On January 13, 1992, law enforcement officers sought the items of clothing to have them analyzed in a laboratory. (Testimony at evidentiary hearing and Undisputed Factual Assertions in the Parties' Motions and Responses.)

4. On January 16, 1992, the United States Department of State, through Peter J. Boynton—designated Secretary of State, issued a declaration as to the following:

a. "I certify that on January 6, 1992, Commander Robert Griffin of the American Embassy in Panama contacted the DIRECCION GENERAL DE CONSULAR Y NAVES ("SECNAVES"), which represents the Government of Panama with authority to verify the registry of vessels claiming Panamanian registration and to consent to the enforcement of law against its vessels by other nations."

b. "That on January 6, 1992, the government of Panama confirmed M/V HARBOUR (AKA M/V GOLDEN HILL) as being legitimately registered in Panama, and authorized the Government of the United States to board and search the vessel."

c. "That on January 6, 1992, following the search of the vessel, the government of Panama authorized the Government of the United States to take appropriate action under U.S. law against the M/V HARBOUR (AKA M/V GOLDEN HILL), its cargo and crew."

The Court finds that the statements contained in the designated Secretary of State's certification accurately reflect the dates of transmission and the contents of the SNO's received by the "Campbell."

### ISSUED RAISED BY DEFENDANTS' MOTIONS

Defendants' motions raise the following issues:

1. In the first motion listed above, the defendants pray for dismissal of the indictment on the grounds that the Court lacks jurisdiction to prosecute the defendants for violation of 46 U.S.C.App. § 1903. Even if the Court has jurisdiction pursuant to section 1903, the defendants argue that a key portion of section 1903 is unconstitutional. The Court notes preliminarily that only Counts I and II of the indictment allege violations of section 1903; Count III is predicated on a different statute. Therefore, the defendants' motion to dismiss addresses only Counts I and II of the indictment.

2. Alternatively, in the first motion, the defendants move to dismiss the indictment or to suppress all the evidence seized from the M/V "Harbour." The basis of this alternative motion is that the consent which the Panamanian government granted the United States government to board and search the "Harbour" is voided by lack of full disclosure.

3. In the remaining seven motions, the defendants pray for the suppression of evidence seized from their cabins. Specifically, the moving defendants seek suppression of the following personal items:

Osvaldo Sotgiu–Quijada: (1) Videotape (including audio) of search of Sotgui's cabin.
(2) Paper listing security watch schedule.
(3) One pair of sneakers, one pair of gloves, one pair of shorts and dust mask.
(4) One calculator.
(5) Several papers pertaining to the cargo and vessel.
(6) One blue notebook labeled "Control de Trabajos Diarios".
(7) And any and all other items seized by Government agents during the various warrantless searches of Sotgiu's cabin.

Yerco Huerta Rojas: (1) All physical evidence seized from Rojas' living quarters.

Carlos A. Carreno: (1) One pair of boots.

Luis Lorenzo Berrios: (1) Any and all physical evidence including: clothes, papers, documents and film.

Claudio Perez Gomez: (1) All items of clothing, personal property, etc. which belong to Gomez.

Leandro Mondaca: (1) One pair of shorts.
(2) One pair of sneakers.

Gabriel Munoz–Silva: (1) Airline ticket in Munoz–Silva's name.
(2) One sneaker.
(3) One bank receipt.

---

## LEGAL ANALYSIS

Application of the pertinent case law to the Court's findings of fact leads the Court to deny the defendants' prayers for relief.

### 1. The motion to dismiss for lack of jurisdiction:

The defendants assert that the Court lacks jurisdiction to prosecute them under 46 U.S.C.App. § 1903. Section 1903(a) provides, in pertinent part, that, "It is unlawful for any person ... on board a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance." Section 1903(c)(1)(C) classifies "a vessel registered in a foreign nation where the flag nation has consented or waived objection to the enforcement of United States law by the United States" as a vessel subject to the jurisdiction of the United States. Section 1903(c)(1) further provides: "Consent or waiver of objection by a foreign nation to the enforcement of United States law by the United States under subparagraph (C) ... of this paragraph may be obtained by radio, telephone, or similar oral or electronic means, and may be proved by certification of the Secretary of State or the Secretary's designee." Finally, Section 1903(d) provides that, "A claim of failure to comply with international law in the enforcement of this chapter may be invoked solely by a foreign nation, and a failure to comply with international law shall not divest the court of jurisdiction or otherwise constitute a defense to any proceeding under this chapter."

■ Preliminarily, the Court finds that, pursuant to the statutory language, the defendants have no standing to assert as a defense non-compliance with international law. Defendants do have standing to challenge the government's compliance with the jurisdictional provisions of section 1903. *United States v. Mena*, 863 F.2d 1522, 1531 (11th Cir.), *cert. denied*, 493 U.S. 834, 110 S.Ct. 109, 107 L.Ed.2d 72 (1989). In *Mena*, the Eleventh Circuit resolved a perceived statutory ambiguity in section 1903 in favor of the criminal defendant because "if Congress had intended to deprive defendants of standing to object to the government's non-compliance with the terms of section 1903(a), Congress would not merely have prevented defendants from raising objections under international law." *Id.*

■ Having addressed the issue of standing, the Court proceeds to analyze the government's compliance with section 1903 in obtaining Panama's consent. As noted in the findings of fact, the defendants were aboard the M/V "Harbour," a vessel registered in Panama, when the incidents giving rise to their indictment took place. The United States Coast Guard Cutter "Campbell's" rescue and assistance team initially boarded the "Harbour" for a brief period on the night of January 5, 1992, pursuant to the master's consent, and under conditions of fire and flooding. After determining that the "Harbour" was taking on wa-

652

ter, the team abandoned ship. The defendants cannot contest this initial boarding, which was made as a matter of distress, by invitation. The defendants have raised colorable arguments, however, concerning the January 6, 1992 Coast Guard boardings and the resulting warrantless search and seizure of the "Harbour" and arrest of its crew.

In its findings of fact, however, the Court has concluded that the United States obtained oral consent from the Panamanian government prior to the Coast Guard's boarding and searching the "Harbour;" and again prior to its seizing the vessel and arresting its crew, in accordance with United States law. Specifically, the Court has found that at 10:44 on January 6, 1992, the "Campbell" received a statement of no objection (SNO) to board and search the "Harbour." The rescue and assistance team boarded the "Harbour" at 10:45; and the sweep team, which conducted the search, boarded at 11:27. Similarly, the Court has found that at 19:55 on January 6, 1992, the "Campbell" received a statement of no objection (SNO) to seize the "Harbour" and arrest its master and crew. Coast Guard personnel seized the "Harbour" at 20:23 and arrested the master and crew at 21:08. This process comports with the consent and waiver provision in section 46 U.S.C.App. § 1903(c)(1), which provides that consent "may be obtained by radio, telephone, or similar oral or electronic means." Moreover, the Court has found that the consent communicated via the SNO's is fully documented and confirmed in the correspondence between the American Embassy and the Panamanian government. The Court, therefore, finds that, pursuant to the Panamanian government's consent, the M/V "Harbour" is a vessel subject to the jurisdiction of the United States. Hence, contrary to the defendants' assertion, the Court does have the requisite jurisdiction under section 1903 to prosecute the defendants.

The defendants further argue, that even if the Court has jurisdiction, the provision in section 1903(c)(1), permitting proof of consent by certification of the Secretary of State or its designee, is unconstitutional. The Court finds that it need not reach this issue. The government has proffered three sources of proof for Panama's consent: receipt of the SNO's by the "Campbell," as documented in its log; copies of the correspondence between the American Embassy and the Panamanian government formally documenting and confirming the oral consent; and the Secretary's certification. Because the government has not relied solely on the Secretary's certification, the purported unconstitutionality of this alternative method of proof has no impact on this case.

Although the Court denies the defendant's motion to dismiss at this stage in the proceedings, based on the facts adduced for this purpose, the Court notes that Eleventh Circuit case law is unsettled on the question of whether the issue of jurisdiction should be addressed by the jury. According to the First Circuit, "jurisdiction constitutes a factual as well as legal element of the crime" of violating section 1903, making the question of jurisdiction "appropriate for the jury." *United States v. Piedrahita–Santiago*, 931 F.2d 127, 129 (1st Cir.1991). *See also United States v. Cuevas–Esquivel*, 905 F.2d 510, 513–14 (1st Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 208, 112 L.Ed.2d 169 (1990); *United States v. Maynard*, 888 F.2d 918, 926 n. 4 (1st Cir.1989); *United States v. Potes*, 880 F.2d 1475, 1478 n. 1 (1st Cir.1989).

The Eleventh Circuit has acknowledged this line of cases from the First Circuit, but has found it unnecessary to definitively resolve the issue. *United States v. Garate–Vergara*, 942 F.2d 1543, 1552–53 (11th Cir.1991), *cert. denied sub nom., Contreras v. United States*, —— U.S. ——, 112 S.Ct. 1212, 117 L.Ed.2d 451 (1992). *See also United States v. Mena*, 863 F.2d 1522, 1532–33 (11th Cir.1989) (noting an apparent conflict in Eleventh Circuit authority on this point, but finding jurisdiction under section 1903 "whether the issue is one of fact or law.").

Under section 1903's predecessor statute, 21 U.S.C. § 955a, the Eleventh Circuit has upheld factual findings of jurisdiction made

by a district court in connection with the denial of a motion to dismiss. *United States v. Matute,* 767 F.2d 1511, 1513 (11th Cir.1985). In a later case, the Eleventh Circuit commented, however, that the parties in *Matute* "did not raise any issue as to the proper procedure for determining the sufficiency of the evidence to support" the district court's jurisdictional finding. *United States v. Ayarza–Garcia,* 819 F.2d 1043, 1049 n. 2 (11th Cir.), *cert. denied,* 484 U.S. 969, 108 S.Ct. 465, 98 L.Ed.2d 404 (1987). The Court, therefore, denies the motion to dismiss mindful of the possibility that the defendants may chose to revisit this subject, by challenging the sufficiency of the evidence presented to the jury on the issue of jurisdiction.

B.   *The alternative motion to dismiss the indictment or to suppress all evidence:*

█  Alternatively, the defendants seek dismissal of the indictment or suppression of all evidence by asserting that the Panamanian government's consent is voided by lack of full disclosure. The defendants claim that only consent which has been obtained free of deceit, material misrepresentation, or fraud is valid and enforceable. (Defendant's Motion to Dismiss, at 11 (citing *United States v. Tweel,* 550 F.2d 297, 299 (5th Cir.1977))). The Court has found no evidence of deceit, material misrepresentations, or fraud on the part of the government, which would vitiate Panama's consent. As noted above, the Court has found concordance between the SNO's, the confirming correspondence exchanged by the American Embassy and the Panamanian government, and the Secretary of State's certification.

Moreover, the defendants' reliance on *United States v. Davis,* 905 F.2d 245 (9th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991) for challenging the validity of Panama's consent is misplaced. In *Davis,* the Coast Guard searched the vessel "Myth," pursuant to 46 U.S.C.App. § 1903(c)(1)(D). *Id.* at 249. Section 1903(c)(1)(D) provides that vessels located within the customs waters of the United States are subject to the jurisdiction of the United States. Other statutes define customs waters. The Coast Guard's search of the "Harbour," however, was not grounded on the customs waters concept. Hence, the considerations that the defendants cited from *Davis* are inapposite to this case. The Court, therefore, concludes that Panama's consent is not void.

C.   *The motion to suppress evidence seized from the cabins:*

The defendants pray for suppression of the evidence seized from their cabins after the "Harbour" arrived in Port Everglades, Florida. As noted above, several defendants have listed specific personal items for suppression. In considering the defendants' motion to suppress, the Court includes those items, as well as all other materials which the government obtained from the crew's cabins.

█  "[A] full stem to stern search may be undertaken on probable cause." *United States v. Lopez,* 761 F.2d 632, 636 (11th Cir.1985). In *Lopez,* however, the Eleventh Circuit left unanswered the applicability of this broad "stem to stern" rule to a sailor's private quarters. *Id.* at 635–636 ("However, the instant case does not involve the search of such private spaces as the sailors' sleeping quarters or personal belongings; rather, this was a search of a secret compartment beneath the deck of the boat."). Arguably, a sailor has a legitimate expectation of privacy in his living space and personal belongings, which he cannot claim for the common areas of the vessel. *Id.* at 635. Indeed, the former Fifth Circuit has analogized a ship to a home. *United States v. Cadena,* 588 F.2d 100, 101–102 (5th Cir.1979). Therefore, the Court analyzes the search of the "Harbour" cabins in the context of the privacy concerns applicable to the search of a home.

Although "[t]he warrantless search of a home is presumptively unreasonable," *United States v. Tobin,* 923 F.2d 1506, 1510 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 299, 116 L.Ed.2d 243 (1991) (citing *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)),

"[a] warrantless search is allowed ... where both probable cause and exigent circumstances exist." *Id.* Full application of the home analogy, therefore, would require a showing of both exigent circumstances and probable cause for the warrantless search of the "Harbour" cabins to be lawful.

Because the Coast Guard initially found cocaine in the ship's hold, the Court finds that there was probable cause to search the entire vessel, including the cabins. The defendants assert, however, that exigent circumstances had ceased to exist when the search of the cabins occurred. Although the Court agrees with this proposition, the Court takes into account an additional factor that makes the exigent circumstances requirement of home searches irrelevant to the cabin searches in the "Harbour." The government searched the private quarters of the "Harbour" after the vessel arrived at Port Everglades, an international border. "Searches at our borders by customs agents without probable cause and without a warrant are reasonable and therefore do not violate the Fourth Amendment." *United States v. One (1) Stapleton Pleasure Vessel Named Threesome,* 575 F.Supp. 473, 479 (S.D.Fla. 1983) (citing *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)). The Court, therefore, finds that the warrantless search of the cabins was not a violation of the Fourth Amendment.

In any event, a crewman does not have an expectation of privacy in abandoned property. *United States v. Edwards,* 644 F.2d 1, 2 (5th Cir. Unit B) *cert. denied,* 454 U.S. 855, 102 S.Ct. 302, 70 L.Ed.2d 148 (1981). "The test [for abandonment] is whether the defendant voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Id.* (citing *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973)). Furthermore, "Abandonment is primarily a question of intent, and intent may be inferred from words, acts and other objective facts."

*United States v. Scrivner,* 680 F.2d 1099, 1100 (5th Cir.1982).

As noted in the findings of fact, the "Harbour" crew lowered a jacob's ladder and bailed out of the "Harbour" on life boats when it started taking on water and fires had erupted. The Court, finds, therefore, that the defendants voluntarily abandoned the property left in their cabins. Moreover, the Court finds that the evidence supports the inference that prior to abandoning ship the crew engaged in a generalized effort to scuttle the ship. Therefore, the defendants' argument that the master's order to leave ship caused them to abandon ship involuntarily lacks merit. Having abandoned their property, the defendants do not have standing to challenge the search of their cabins. *United States v. Colbert,* 474 F.2d at 176.

Because the seizure of evidence from the defendants' cabins was not violative of the fourth amendment, the Court concludes that this evidence is not subject to suppression.

## CONCLUSION

Based on the foregoing considerations, it is hereby

ORDERED AND ADJUDGED that

1. Defendant Yerco Huerta Rojas' Motion to Dismiss Indictment and to Suppress Evidence is DENIED;

2. Defendant Osvaldo Sotgiu–Quijada's Motion to Suppress Evidence, Incorporated Memorandum of Law is DENIED and his Request for Evidentiary Hearing is GRANTED NUNC PRO TUNC;

3. Defendant Yerco Huerta Rojas' Consolidated Motion to Suppress Seizure of Personal Effects is DENIED; and his motion to Adopt Similar Motions filed by his Co–Defendants is GRANTED;

4. Defendant Carlos A. Carreno's Motion to Suppress Evidence Re.: Items Seized from Cabin is DENIED;

5. Defendant Luis Lorenzo Berrios' Motion to Suppress Physical Evidence is DENIED;

6. Defendant Claudio Perez Gomez's Motion to Suppress, with Supplement is DENIED;

7. Defendant Gabriel Munoz–Silva's Amendment to Motion to Suppress Evidence is DENIED; and

8. Defendant Leandro Mondaca's Motion to Suppress Evidence Re: Items Seized from Defendant Moncada's Quarters is DENIED; and his Motion to Adopt is GRANTED.

DONE AND ORDERED.